UNITED STATES of America,
Appellee,

v.

John CAPRA et al., Defendants-
Appellants.

Nos. 998, 1022, 1044, 1060, 1061 and 1062,
Dockets 74–1068, 74–1037, 74–1140, 74–
1143, 74–1144 and 74–1148.

United States Court of Appeals,
Second Circuit.

Argued May 9, 1974.

Decided July 26, 1974.

See also, D.C., 372 F.Supp. 609.

Barry Ivan Slotnick, New York City, for John Capra.

David Blackstone, New York City, for George Harris.

Joseph I. Stone, New York City, for Alan Morris.

George L. Santangelo, New York City, for Leoluca Guarino.

Lawrence Stern, Brooklyn, N.Y., for Stephen DellaCava.

Leonard J. Levenson, New York City, for Robert Jermain.

Lawrence S. Feld, Asst. U.S. Atty., S.D.N.Y. (Paul J. Curran, U.S. Atty., Gerald A. Feffer, George E. Wilson, Daniel Beller, S. Andrew Schaffer and John D. Gordan, III, Asst. U.S. Attys., S.D.N.Y., on the brief), for the United States.

Before ANDERSON FEINBERG and MANSFIELD, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

The indictment in this case charges these defendants-appellants, John Capra, Leoluca Guarino, Stephen DellaCava, Robert Jermain, Alan Morris and George Harris, in five counts with violations of the narcotics laws. Count One alleges that all of the defendants conspired to violate the narcotics laws in violation of 26 U.S.C. § 7237(b) and 21 U.S.C. § 846. Counts Two and Three charge Capra, Guarino, DellaCava and Jermain with selling two kilograms of heroin in August, 1970, and one kilogram of heroin on November 6, 1970, respectively, not in pursuance of a written order in violation of 26 U.S.C. §§ 4705(a) and 7237(b). Count Two relates to one of several sales to Morris, discussed infra, by Capra, Guarino, DellaCava and Jermain, and Count Three concerns one of a series of sales to Harris by these same defendants. Count Four charges Capra, Guarino, DellaCava and Jermain with distributing, and possessing with intent to distribute, five and one-half kilograms of heroin in October, 1971, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A); and Count Five charges them with the same offense on that date with regard to one kilogram of cocaine.[1] These counts re-late to the Toledo station delivery, discussed infra. The jury found each of the defendants guilty as charged and a judgment of conviction was entered on each of the verdicts.

There was evidence from which the jury could have found that the defendants Capra, Guarino and DellaCava had formed a New York centered enterprise for the massive marketing of heroin and cocaine in which their functions were loosely but generally divided in this way: Guarino secured the drugs from importers; Capra acted as distributor; and DellaCava made the deliveries.

Later Joaquin Ramos (an admitted co-conspirator but not a defendant) and Jermain transferred drugs from DellaCava in New York to Morris and Harris for sale in the Midwest. Ramos had served 17 years in federal prisons for narcotics violations and after his release in 1969, immediately began to frequent the Havemeyer Social Club in the Bronx, at the invitation of its proprietors, Capra, Guarino and DellaCava. The Club was one of the fronts for the enterprise Guarino offered to reestablish Ramos in the narcotics business, and while the latter considered the proposition, he helped count and secret away money which DellaCava brough into the Club.

By the fall of 1969 Ramos and a partner were distributing a kilo of heroin each month. His usual routine was to place orders with Guarino or Capra at the Club and leave a car there, with a full tank of gasoline, so that DellaCava could pick up the drugs and, after driving around the City to insure that he was not being watched, return, leaving the narcotics in the trunk of the car for distribution by Ramos.

Jermain, whose major customer was Harris, a Detroit drug dealer, entered

---

1. Some of the illegal activities in this case occurred prior to May 1, 1971, when the Comprehensive Drug Abuse Prevention and Control Act of 1970, Public Law 91–153, became effective. These activities formed the basis for substantive counts 2 and 3, which charged violations of the earlier laws, 26 U. S.C. §§ 4705(a) and 7237(b). The remaining substantive counts charged violations of the new laws, 21 U.S.C. § 812, § 841(a)(1), and § 841(b)(1)(A). The conspiracy spanned both these time periods and, thus, violated both 26 U.S.C. § 7237(b) and 21 U. S.C. § 846.

into a partnership with Ramos in March, 1970. On instructions from Capra, they developed a pattern of dealing in which Harris paid for the narcotics with "front money," i. e. payment in advance, and Ramos or Jermain delivered the drugs to him or one of his agents. Later in 1970, Ramos and Jermain established an additional outlet with another Midwestern dealer, Alan Morris, who by 1971 was placing orders every three or four months for approximately $150,000 worth of heroin. As their business expanded, they not only demanded "front money" from Morris, but also refused to meet with him in New York City. Instead, Ramos or Jermain checked the packages of narcotics in public terminals and then forwarded the claim checks to Morris, who picked up the drugs without ever meeting the distributors face-to-face.

The growth of the enterprise, as outlined by Ramos and corroborating witnesses, was further discribed by federal and state narcotics agents who engaged in prolonged and intensive surveillance of these defendants.

In their several appeals the defendants-appellants launch their principal attacks upon their convictions by arguing that the trial court's denials of their pre-trial suppression motions, relating to the admission of evidence of certain instances or episodes of joint criminal activities by them, were error and call for reversal. These occurrences, hereinafter more particularly described, were the Toledo railroad station delivery, the wiretap at Diane's Bar, and the discovery of heroin traces and other evidence taken from DellaCava's car on April 14, 1973. The appellants further claim that improper press coverage at the time of their arrests also requires reversal of all the judgments of convictions. These issues will be discussed seriatim.

*I. The Toledo Railroad Station Delivery*

In the summer of 1971, Morris placed a large order with Ramos for heroin and cocaine, for which he delivered payment of approximately $150,000 "front money" in New York City in September. During a meeting with Capra at the Lake Isle Country Club in Westchester, New York, Ramos put this cash in the trunk of Capra's 1972 Lincoln Continental.

Capra, Guarino, DellaCava, Jermain and Ramos decided that delivery of the narcotics should be at the baggage room of the Toledo railroad station, and on October 20, 1971, at 11:13 a. m., shortly after the arrival of the daily train from New York, Ramos checked a dark Samsonite suitcase containing the drugs with the Toledo baggage agent.

Because of what he believed to be suspicious circumstances concerning the baggage check, including Ramos' appearance and attitude, as well as the fact that luggage was normally left in lockers and not in the baggage room, the baggage agent feared the suitcase might contain a bomb particularly after it remained unclaimed for over a week. On October 28, one of the agents, with the assistance of the Toledo police, opened the suitcase and discovered the 5½ kilos of heroin and the 1 kilo of cocaine.

Willie Middlebrook, an unindicted co-conspirator, presented the claim check on October 30, at 8:50 a. m. and after receiving the suitcase, went upstairs and met Morris in a luncheonette where they were both arrested.[2]

The distribution of these narcotics formed the basis of Counts Four and Five against Capra, Guarino, DellaCava and Jermain. The narcotics were also used as evidence of the conspiracy, Count One. Capra, Guarino, and DellaCava claimed that the drugs were

---

2. Morris, Middlebrook and Ramos were convicted in August, 1972 for possession of these narcotics in violation of Ohio state law. Ramos, a second offender, was sentenced to 10 to 20 years imprisonment, and in November, 1972, he agreed to turn state's evidence in return for the government's promise to aid him in securing parole.

illegally seized, but the trial court ruled that none of these defendants had standing to raise Fourth Amendment objections to the admission of this evidence because none of them had retained a possessory interest in it.

■ The defendants contended that Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), grants them automatic standing in possessory crimes. The Supreme Court, however, has recently limited the availability of automatic standing under *Jones* to, at most, those charged with "an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure." Brown v. United States, 411 U.S. 223, 229, 93 S. Ct. 1565, 1569, 36 L.Ed.2d 208 (1973); *see* United States v. Pui Kan Lam, 483 F.2d 1202 (2 Cir. 1973); United States v. Sullivan, 488 F.2d 138 (5 Cir 1973); United States v. Hutchinson, 488 F.2d 484 (8 Cir. 1973).[3] These defendants were not charged with physical possession at the time the goods were seized and, therefore, under the new criteria for standing stated in the *Brown* case, they had the burden of proving that they had retained a possessory interest.

■ To prove that interest, Capra, Guarino and DellaCava testified at the suppression hearing that the suitcase was theirs, that $38,000 was still owing for the drugs, and that their understanding with Morris was, if the drugs were defective in quality or stolen prior to delivery at Toledo, the front money would be returned. The trial judge dismissed these arguments as unpersuasive and held that the defendants transferred any interest they may have had in the suitcase or its contents when Ramos checked it on October 20, 1971; that

any continuing interest of the defendants in the $38 suitcase, itself, was negligible; that the receipt of the front money satisfied the monetary interest which they had in the narcotics; and that any warranty as to the quality of the narcotics or any special contract conditions as to risk of loss were irrelevant to the question of ownership of the seized goods. See United States v. Palazzo, 488 F.2d 942, 947–948 (5 Cir. 1974). These findings were further supported by Ramos' testimony at the trial that all of the front money went to Capra, Guarino, and DellaCava, and that the balance due of $38,000 was the share belonging to Jermain and him. Where defendants, through the use of front money and baggage checks, have exerted such efforts to insulate themselves from personal possession of narcotics, they are hardly in a position to object that they have been "hoist with their own petard." None of the defendants was able to prove that his reasonable expectations of privacy were infringed by the search of the suitcase, see Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and, consequently, each lacks standing to challenge the legality of the search.

■ While Jermain might have been able to establish a possessory interest on the basis of the money owed, he did not seek to do so at trial and cannot make such a claim for the first time now. See United States v. Gitlitz, 368 F.2d 501 (2 Cir. 1966), cert. den. 386 U.S. 1038, 87 S.Ct. 1492, 18 L.Ed.2d 602 (1967).

■■ The trial court, therefore, was correct in denying the motions to suppress because these defendants lacked standing to question the propriety of this search and seizure.[4]

---

3. Defendants are no longer forced to choose between admitting guilt or asserting constitutional rights because Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed. 2d 1247 (1968), holds that nothing a defendant states to prove standing can be used against him as evidence in chief at trial.

See United States v. Pui Kan Lam, 483 F.2d 1202, 1205 n. 4 (2 Cir. 1973).

4. Assuming arguendo that the defendants did have standing, this court is in agreement with the trial court's alternative holding, that this was a private search, and not sub-

## II. *The Wiretap at Diane's Bar*

To corroborate Ramos' testimony that this was an ongoing conspiracy involving all the defendants, the Government offered several transcripts and recordings of wiretaps involving DellaCava, Guarino, and Capra, and the testimony of the officers who conducted surveillance of the defendants on the basis of leads provided by the wiretapping. The defendants moved, prior to trial, for the suppression of this entire line of evidence on the ground that it was the product of unauthorized eavesdropping.

At the suppression hearing the evidence disclosed that in an investigation, unrelated to the Toledo search, the New York City Police, in late 1971, began surveillance of Diane's Bar at 2034 Second Avenue, Manhattan, where a reliable informant had said one Joseph Della-Valle was using the public telephone to arrange narcotics sales. Detective George Eaton of the Special Investigations Unit, Narcotics Division, listened to two telephone conversations between the informant and DellaValle when narcotics orders were confirmed. On the basis of these calls, personal observation, and other information provided by the informant, Eaton and a New York State Assistant District Attorney, Clifford Fishman, prepared an affidavit and application for an eavesdropping warrant pursuant to Article 700 of New York's Criminal Procedure Law. In his affidavit, Eaton apprised the court that he could recognize DellaValle's voice, based on the two prior calls, and on December 8, 1971 a state court warrant was issued for "the interception of telephonic communications of Joseph DellaValle with co-conspirators, accomplices and agents."

Although Eaton had previously participated in wiretaps, Fishman had never supervised such an operation. But more experienced members of the prosecutor's office briefed Fishman on the danger of intercepting non-pertinent telephone calls, and Eaton's superior in the police department, Lieutenant John Hill, testified that, prior to the installation of the wiretap, Fishman had reviewed with Hill and Eaton certain precautionary procedures which they, in turn, repeated to all the other police participants in the eavesdropping.

Extensive background noise at the Bar interfered with attempts to quickly discover the nature of the intercepted conversations. The officers frequently had difficulty understanding the words of the parties, and the pertinency of what was said was not immediately apparent because all narcotics transactions were disguised by use of various codes, i. e. "Christmas presents" meant heroin, a "chess game" signified an exchange of narcotics, and a "four-room house with two stories" indicated four kilograms of heroin, cut twice.

ject to the Fourth Amendment. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L. Ed. 1048 (1921). The government did not instigate this search, United Staets v. Cangiano, 464 F.2d 320 (2 Cir. 1972), vacated on other grounds, 413 U.S. 913, 93 S.Ct. 3047, 37 L.Ed.2d 1023 (1973), aff'd 491 F.2d 905 (2 Cir. 1973), cert. denied, —— U.S. ——, 94 S.Ct. 3223, 41 L.Ed.2d 1171; rather, it was motivated by a genuine concern on the part of railroad personnel for the safety of railroad property, fellow employees, and themselves. See United States v. DeBerry, 487 F.2d 448 (2 Cir. 1973). This concern was understandably engendered by the unusual baggage check, Namos' nervous behavior, the weight of the suitcase, the delay in claiming it, and prior exposure, through media and personal experience, to bomb scares. Police participation was not so pervasive that the opening of the suitcase was primarily for "the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action." Haerr v. United States, 240 F.2d 533, 535 (5 Cir. 1957). And when police are merely assisting a private party, who has authority to search and a legitimate need to do so, see United States v. Antonelli, 434 F.2d 335 (2 Cir. 1970), courts are reluctant to exclude resulting evidence. Wolf Low v. United States, 391 F.2d 61 (9 Cir.), cert. den. 393 U.S. 849, 89 S.Ct. 136, 21 L.Ed.2d 119 (1968). See generally United States v. Blum, 329 F.2d 49 (2 Cir.), cert. den. 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1045 (1964).

The officers suspected at times that they might be confusing DellaValle's voice with that of another unidentified narcotics operator who had a similar husky voice. Even those officers who, under another provision of the warrant, were eavesdropping on DellaValle's conversations over his home telephone, could not tell whether a second voice was being intercepted at the Bar. Eaton became concerned when the individual overheard was continuously called "Beansy," which was not one of Della-Valle's known nicknames; references were made to "Beansy's wife" while Del-laValle was thought to be single; and "Beansy" was said to be tending bar, which was not DellaValle's known occupation. But because of the voice and the nature of the business transacted, Eaton testified that he was reasonably sure that "Beansy" and DellaValle were one and the same individual until 2:15 in the afternoon, Sunday, December 19, when the speaker turned away from the telephone and was heard to ask, "How long are you going to be here Beans?"

The next day Eaton reported to Fishman that they had been inadvertently tapping two different individuals. Fishman replied that the warrant would have to be amended, but instructed Eaton to continue monitoring and surveillance to establish "Beansy's" identity, although Fishman and Eaton both testified that they were aware that a person's identity was not necessary to secure a "John Doe" warrant. See United States v. Kahn, 415 U.S. 143, 94 S.Ct. 977, 39 L. Ed.2d 225 (1974). Even after Beansy was identified as DellaCava, Fishman did not proceed with dispatch to have the warrant amended. He conferred with others in his office on amendment procedures; then took a long Christmas weekend; and when he finally completed personally typing the application on January 2, 1972, he decided to hold it for four more days when the warrant expired and had to be renewed in any event. The warrant, therefore, did not authorize the interception of DellaCava's telephone conversations until January 6,

1972, 18 days after the police received notice that "Beansy" was not DellaValle, and 17 days after Fishman had been so informed.

Meanwhile, at 6:30 p. m., December 23, the police overheard "Beansy" call Ray's Stationery in the Bronx and ask for "Leo" or "Johnny Hooks." "Hooks" answered the telephone and told "Beansy" to pick up a package. Eaton followed "Beansy" to a Bronx Social Club where he saw him take a package from a Lincoln Continental and place it in his car trunk. Eaton traced the license plates on both cars and found that the Lincoln belonged to John Capra and that "Beansy's" car was registered in the name of Stephen DellaCava. Subsequent investigation confirmed that "Hooks" was Capra's alias, that "Beansy" was DellaCava, who tended bar at Diane's, and that "Leo" was Leoluca Guarino.

On the basis of this evidence, Capra, Guarino and DellaCava claimed: that Eaton had insufficient grounds to secure an eavesdropping warrant because he could not distinguish DellaValle's voice; that he had previously investigated DellaCava and was actually trying to intercept his calls when he applied for a warrant; that the police had failed to minimize the interception of calls unrelated to the original warrant authorization; and that all interceptions of DellaCava's calls prior to the renewal of the warrant on January 6, 1972 were unauthorized. The defendants contended that if the trial court upheld any of these objections, all evidence which was the product of this wiretap should be suppressed.

The trial court found that Eaton's recognition of DellaValle's voice was founded on the two prior phone calls; that the New York court was fully apprised of this; and, that the warrant was, therefore sufficient on its face. It also found that Eaton's previous contact with DellaCava had been a brief and insignificant part of an earlier unrelated wiretap which did not concern or result in any investigation of the defendant or Diane's Bar and that the warrant is-

sued in the present case, therefore, was not based upon pretext.

In connection with the minimization claim, defendants alleged that all calls, including non-pertinent calls to and from this public telephone had been monitored in full in violation of New York Crim.Pr.L. § 700.30(7) and 18 U. S.C. § 2518(5). But after an intensive analysis of the intercepted calls, the trial court found that out of the 1561 calls listed (1159 of which reached the party intended) only 751 were recorded in full. Approximately 620 of these did not exceed two minutes, and 200 of the 235 calls involving DellaCava were also less than two minutes in duration. While the police did record several privileged conversations including a few with family members and one with a lawyer, the trial court found that this was not a commonplace practice in the extensive investigation. As a result of this analysis as well as Fishman's and Eaton's efforts to limit interception of non-pertinent calls, the district court concluded that "all reasonable efforts were made to comply with legal requirements."

The district court recognized that one of the most difficult questions in this case concerned the legality of the interception of DellaCava's conversations. It found that the confusion of DellaValle's and DellaCava's voice was a good faith mistake, caused by their similarity and the poor monitoring conditions, and, therefore, held that there was no violation of the eavesdropping warrant prior to the realization that "Beansy" was not DellaValle. It, however, also held that the police and the State prosecutor did commit error in delaying the application for an amendment of the warrant until 17 days after they learned that "Beansy" was not DellaValle. But the court said the delay was "reasonable and outlawry . . . [was] not warranted" because of the State prosecutor's inexperience and lack of secretarial assistance, as well as the intervention of the holidays.

At the trial, therefore the court overruled the defendants' objections and admitted the evidence which resulted from the wiretapping, and the defendants appeal from each of those rulings.

This court is of the opinion that the trial court correctly ruled that the warrant, on which the wiretapping was based, was legally sufficient. The requisite contents of an affidavit for a state warrant are determined by state law, United States v. Manfredi, 488 F.2d 588 (2 Cir. 1973), application for cert. pending 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 and so long as the affiant presents a sufficient and truthful basis for a warrant, reviewing courts in New York have usually upheld the issuance of the warrant. See People v. Porter, 44 A.D.2d 251, 354 N.Y.S.2d 424 (1974). In this case, the State court issued the ex parte order on the reasonable assumption that Eaton could distinguish DellaValle's voice over a public telephone in a bar and the fact that this assumption was frustrated to a substantial degree by an unusual combination of circumstances does not render nugatory the supporting affidavit.

This court is also in accord with the district court's ruling that the issuance of the warrant by the State court was not based upon a pretext. See People v. Asaro, 57 Misc.2d 373, 291 N.Y.S. 2d 613, aff'd 34 A.D.2d 968, 312 N.Y.S. 2d 807 (1968).

In reviewing the district court's ruling on minimization, state law must again be applied, United States v. Rizzo, 491 F.2d 215 (2 Cir. 1974); New York, however, has interpreted its minimization provisions in light of the federal statute which goes no "further than to require that the methods used to effect minimization be in good faith and reasonable." United States v. Manfredi, 488 F.2d at 600; United States v. Tortorello, 480 F.2d 764 (2 Cir.), cert. den. 414 U. S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); see also People v. Castania, 73 Misc.2d 166, 340 N.Y.S.2d 829 (Monroe Cty Crt 1973). Although the trial court's analysis of these interceptions revealed that many non-pertinent calls

had been intercepted, a vast majority of these did not exceed two minutes, "too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation," especially under the circumstances of this case. United States v. Bynum, 485 F.2d 490, 500 (2 Cir. 1973), judgment vacated on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). Defendants asserted that the interception of any non-pertinent calls is prima facie evidence of failure to minimize, but the trial court correctly concluded that the police in this case reasonably complied, in good faith, with minimization requirements.

■ The trial court's denials of the defendants' motions to suppress the evidence resulting from the calls to and from DellaCava between December 19, 1971 and January 6, 1972, were, however, error. The warrant only authorized the interception of conversations by Joseph DellaValle "with" conspirators; and the knowing interception of calls involving DellaCava, rather than DellaValle, was, therefore not within the officers' discretion. Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927).[5]

The government asserts that whatever infirmity resulted from this warrantless tapping was cured by the inclusion of DellaCava in the renewed warrant issued on January 6, 1972, but it fails to state from what source it derived the authority to maintain the warrantless eavesdropping for the preceding 17 days. New York's eavesdropping statute makes no provision for warrantless interception, New York Crim.Pro.L., Art. 700,[6] and the government has cited no cases in which New York courts have construed this statute otherwise.[7]

■ Moreover, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, P.L. 90–351, 18 U.S.C. § 2510 et seq., prohibits warrantless eavesdropping, except under two specially defined circumstances, i. e., national security and an emergency. Title III creates federal wiretapping procedures that also operate as national standards which only permit the states "to adopt *more* restrictive legislation, or no legislation at all, but *not less* restrictive legislation." (Emphasis added.) Senate Rpt. No. 1097, April 29, 1968, 1968 U.S. Code Cong. and Admin.News pp. 2112, 2187. The standards are to be construed strictly, because Congress knew that it was creating an investigative mechanism which potentially threatened

---

5. Because this court is of the opinion that reversal of the conspiracy count as to Capra, Guarino and DellaCava is mandated by both the illegal wiretapping after December 19 and the resulting taint of police surveillance and subsequent wiretaps, see United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), the questions of whether the interception of DellaCava's conversations prior to December 19, when the trial court found that the officers in good faith reasonably believed that they were listening to DellaValle, was authorized by State law and within the meaning of the federal wiretapping law, 18 U.S.C. § 2510 et seq., or permissible under the Constitution, Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), are left open for future consideration.

6. The New York Constitution, Art. 1 § 12, apparently bars warrantless wiretapping:

"The right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated, and ex parte orders or warrants shall issue only upon oath or affirmation that there is reasonable ground to believe that evidence of crime may be thus obtained, and identifying the particular means of communication, and particularly describing the person or persons whose communications are to be intercepted and the purpose thereof."

7. People v. Sher, 68 Misc.2d 917, 329 N.Y.S. 2d 2 (Green Cty Crt 1972) permits retroactive amendment of a New York warrant to substitute specifically identified persons for "John Does" and to add new crimes to those previously listed on the warrant. Neither of these changes invades the privacy interests of a person whose conversations could not have been intercepted under the original authorization.

the constitutional right to privacy, and it carefully wrote into the law the protective procedures for the issuance of warrants which the Supreme Court had declared in Katz v. United States, *supra,* and Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), were "constitutional precondition[s] of . . . electronic surveillance." Katz, at 359, 88 S.Ct. 507; see 1968 U.S. Code Cong. and Admin.News p. 2113, *supra.*

Under 18 U.S.C. § 2518(10)(a), Congress made clear its intention "to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L. Ed.2d 341 (1974). See also In Re Evans, 146 U.S.App.D.C. 310, 452 F.2d 1239 (1971), cert. den., 408 U.S. 930, 92 S.Ct. 2479, 33 L.Ed.2d 342 (1972).

■ Obviously failure to amend the warrant was not justified by national security considerations, or by the presence of an emergency.[8] Even assuming arguendo that DellaCava's conversations constituted an emergency within the meaning of § 2518(7)(a), the continuation of the eavesdropping for 17 days would still not qualify under the emergency exception to the statute because such interceptions must be terminated within 48 hours if, within that time, no warrant has been secured. Id.[9]

■ The district court, therefore, had no discretion to decide whether to exclude the evidence obtained in violation of Title III. The good faith efforts and worthy intentions of the police, the prosecutor's lack of experience and need of secretarial assistance, as well as his election to give priority to a holiday, are wholly extraneous considerations.

■ All of DellaCava's intercepted conversations between December 19, 1971 and January 6, 1972, are ordered suppressed.[10]

*Publicity at Time of Arrests*

Capra, Guarino, and DellaCava were arrested on the night of April 13, 1973, as part of a round-up of over 80 alleged narcotics dealers. Three days later, New York newspapers, each of which have extensive circulation, carried front-page articles which featured de-

---

8. Congress had in mind by use of the term "emergency" an important event, limited in duration, which was likely to occur before a warrant could be obtained. Senate Rpt. No. 1097, 1968 U.S.Code Cong. and Admin.News, pp. 2112, 2193.

9. The government contends that United States v. Cox, 449 F.2d 679 (10 Cir. 1971), cert. den. 406 U.S. 934, 92 S.Ct. 1783, 32 L. Ed.2d 136 (1972), construes the federal statute to permit a court to validate by retroactive approval a warrantless interception. Like People v. Sher, *infra,* n. 4, however, Cox merely allowed police, who were authorized to listen to all conversations concerning a particular crime over a private telephone but who also overheard another conversation about plans for a different criminal offense, to continue to listen to conversations relating to both crimes without immediately seeking an amendment to the warrant.

10. Defendants also continue to argue in this court that all interceptions, even those prior to December 19, must be suppressed because the government failed to provide an inventory of the intercepted phone calls within the statutory time period, N.Y.Crim.Pro.L. § 700.50(3), and because the tapes were not immediately sealed after the eavesdropping ceased. *Id.,* § 700.50(2). The trial court found that the State court had authorized the delay in filing the inventory in order to protect the secrecy of on-going investigations and that the defendants had shown no prejudice resulting from either delay. Under these circumstances, the trial court was correct in holding that neither New York nor federal law requires suppression. People v. DiLorenzo, 69 Misc.2d 645, 330 N.Y. S.2d 720 (Rockland Cty Ct. 1971); United States v. Cirillo, 499 F.2d 872 (2 Cir. 1974); United States v. Manfredi, 488 F.2d 588 (2 Cir. 1973), application for cert. pending 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240; United States v. Rizzo, 492 F.2d 443 (2 Cir. 1974).

tailed on-the-scene reports of the arrests. *New York Post*, 4/16/73, p. 1, 4; *New York Daily News*, 4/17/73, p. 1, 3, 11–13, 39; *New York Times*, 4/17/73, p. 1, 37. The *New York Daily News* showed photographs of Capra in handcuffs leaving his house, the police car on the freeway carrying Capra to the federal detention center, and Guarino, handcuffed, entering the detention center. The *News*' on-the-scene report included a description of the interior of Capra's "opulent" New Rochelle home on the night of the arrest.

At a suppression hearing regarding another issue Bernard Gallespie, the New York police sergeant who arrested Capra, disclosed that the New York City Police Public Relations Director, who was a non-commissioned officer, and a *New York Daily News* reporter had accompanied him on the night of the arrest and that they had entered Capra's home. These men were not identified at the house as reporters, and the Capra family apparently assumed that they were plain-clothesmen. Gallespie stated that a *New York Magazine* reporter and a *New York Times* photographer were also outside Capra's house that night.

The trial judge questioned the veniremen to make sure that none of them had prior knowledge of this case; the court also allowed the defendants six additional preemptory challenges to insure impartiality. The defendants, therefore, after the selection of the jury, did not claim that the jurors had been influenced by the publicity, but they did contend that the trial court, under its supervisory powers, should suppress the indictment because the government actively encouraged this publicity. The trial court withheld its ruling on the motion until the jury had returned its verdicts, at which time the court posed a series of questions to the government to determine the extent and nature of the prearranged publicity.

The government's answers established that on the evening of April 13, 15 minutes before the officers, who were to participate in the secret arrests, met for a briefing at the New York headquarters of the Bureau of Narcotics and Dangerous Drugs, the Narcotics Unit Chief of the United States Attorney's office was informed that members of the press would be present during part of the briefing and would accompany officers making arrests. He initially objected but he acquiesced when the Chief of Domestic Enforcement of the United States Drug Enforcement Administration and New York City's Deputy Police Commissioner for Organized Crime Control insisted that the only way to keep the raids secret and prevent possible flights of the accused was to guarantee to members of the press a special story which they, in turn, agreed not to publish for three days.

The government denied that the press was allowed to attend the entire briefing and asserted that, in accordance with the public relations guidelines of the Department of Justice, 28 C.F.R. § 50.2, the reporters were only provided with the names of the defendants, their addresses, age, marital status, and the charges against them. Nonetheless, the trial court pointed out that newspaper photographs showed the briefing session in progress, and that the newsmen appeared to have been fully cognizant of the code words and the communications system to be used.

The government admitted that after the briefing, members of the press did accompany officers to the various scenes of arrest. It conceded that this was in contravention of the guidelines of the Justice Department, *supra,* and stated that it would use its best efforts to insure that such an incident would not recur. The government, however, failed to assure the trial court that members of the press would not be allowed to attend arrest briefings in the future.

Although the trial court was of the opinion that the government's conduct was ill-conceived and said it was particularly concerned because the government apparently did not intend to exclude the

members of the press from arrest briefings, it held that the circumstances did not require the suppression of the indictment.

After oral argument before this court, however, the government did state "that the press should not be invited to meetings where law enforcement officers discuss plans to arrest persons accused of criminal conduct," that is to say, arrest briefings.

 The trial court correctly held that there was no showing of prejudice in this case. Absent proof of bias on the part of individual members of a jury, reversal, because of extensive publicity adverse to the accused, is required where, after reading or hearing it, a resulting conclusion of guilt in the minds of the general public would be practically certain, Sheppard v. Maxwell, 384 U. S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), or where improper pressure on a jury was clear from the record itself, Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), neither of which the trial court found here. But allowing members of the press to attend pre-arrest briefings of the police presents the grave danger that undue publicity will, in advance of trial, convict the accused in the minds of the general public and seriously prejudice his right to be accorded a fair trial by an impartial jury.

 The government has belatedly stated that it will not *invite* members of the press to these briefings. In the exercise of its supervisory powers, Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), this court is of the opinion that the Government must not *allow* the press to be present at such meetings.

 The Government's actions did not deny the defendants due process in this case, but to insure that future trials are not prejudiced, the Government must not permit their recurrence.

The trial court's denial of the motion to suppress the indictment is affirmed.

### The Car Search

Prior to trial, DellaCava moved to suppress certain evidence, including $13,900, a machine for sealing plastic bags and some traces of heroin, seized from his car at the time of his arrest on April 14, 1973. After holding a hearing, the trial court found that the following events had occurred.

At the arrest briefings, Detective Eaton, Sergeant Timothy Restivo of the New York Police Department, together with Group Supervisor James Becknar and Special Agent David Samuel of the Bureau of Narcotics and Dangerous Drugs, were assigned to apprehend DellaCava. He had been under surveillance all day and the officers were told that they would find him at Bachelors III, on the Upper East Side. Just before 2 a.m., Eaton saw DellaCava's brown 1973 Oldsmobile 98 parked near the restaurant; officers who were waiting to apprehend others at the scene confirmed that DellaCava was there.

They decided not to arrest him in the restaurant, and thus alert the other suspects, but, rather, to "stake out" his Oldsmobile. Shortly after 2 a.m., DellaCava left the restaurant, made two telephone calls from different public phones, entered his car, and drove off. He was followed by the officers, who stopped him at 86th Street and Lexington Avenue and placed him under arrest. To avoid the crowd which had gathered, the officers decided to transfer the arrest proceedings to an underground sanitation garage at 79th Street and the Hudson River.

Special Agent Samuel testified at the suppression hearing that, upon arrival at the garage, the officers "impounded[ed] the car for safekeeping." Samuel removed the keys from the ignition, and Eaton, Becknar, and Restivo thoroughly searched the entire vehicle. Restivo found the sealing machine and a brown gym bag containing $13,900 in the trunk. Laboratory tests subsequently

revealed that the interior of the bag was covered with traces of heroin powder.

■ The government contended at the hearing that this was a routine inventory search for the protection of the defendant's property, but the trial court properly rejected that argument because, even though the police may have "exercised a form of custody or control" over the car, they clearly conducted the search for the purpose of securing incriminating evidence. Cady v. Dombrowski, 413 U.S. 433, 443, 93 S.Ct. 2523, 2529, 37 L.Ed.2d 706 (1973).

The district court, nevertheless, held that the police, viewing the movements of the defendant on the night of the arrest in light of their prior knowledge of his use of automobiles in narcotics transactions, had reasonable cause to believe that the car was being used to transport contraband and was, therefore, subject to forfeiture. 49 U.S.C. § 781; 21 U.S.C. § 881.[11] The court noted that Samuel had actively worked on the case for a month and, during the eight months prior to the arrest, had become familiar with DellaCava's role. It also found that Eaton had maintained his surveillance of DellaCava since the wiretap at Diane's Bar. The district court stressed that the indictment, under which Della-Cava was arrested, contained allegations

of dealings in narcotics which reinforced the agents' belief that DellaCava was engaged in transporting drugs that evening.

■ If agents have probable cause to believe that a car is or has been used for carrying contraband, they may summarily seize it pursuant to the federal forfeiture statutes and search it. See United States v. Ortega, 471 F.2d 1350 (2 Cir.), cert. den. 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973); United States v. Ayers, 426 F.2d 524 (2 Cir.), cert. den. 400 U.S. 842, 91 S.Ct. 85, 27 L.Ed.2d 78 (1970); United States v. Francolino, 367 F.2d 1013 (2 Cir. 1966), cert. den. 386 U.S. 960, 87 S.Ct. 1020, 18 L.Ed.2d 110 (1967).

■ While agreeing with the trial court "that the question is a close one," this court finds no basis for reversing the district court's holding that "the search on balance should be held lawful" and that there was probable cause to believe that the car was being used to carry contraband on the night of the arrest. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).[12]

11. § 781(a), 49 U.S.C., reads:

"It shall be unlawful (1) to transport, carry, or convey any contraband article in, upon, or by means of any vessel, vehicle, or aircraft; (2) to conceal or possess any contraband article in or upon any vessel, vehicle, or aircraft; or (3) to use any vessel, vehicle, or aircraft to facilitate the transportation, carriage, conveyance, concealment, receipt, possession, purchase, sale, barter, exchange, or giving away of any contraband article."

§ 881(a)(4) of 21 U.S.C. also subjects to forfeiture all vehicles used to transport narcotics.

12. Even if it were assumed that part of Eaton's familiarity with DellaCava's use of automobiles was derived from what was learned by way of the illegal wiretaps sixteen months before, this court would not be justified in finding error in the trial court's

holding of probable cause. The federal agent Samuel, under cross-examination by defense counsel, testified that during the eight months prior to the arrest, he had learned of the Toledo delivery and the respective roles of Capra, Guarino, Ramos and DellaCava. From this, the trial judge could infer that Samuel had knowledge of the fact that Ramos, six months prior to the arrest of DellaCava, had told federal authorities that DellaCava acted as a narcotics deliveryman. None of Ramos' testimony was derived from the illegal wiretaps, United States v. Tane, 329 F.2d 848 (2 Cir. 1964), and, therefore, on the night of the arrest, an independent and untainted source of information supported the agents' decision that DellaCava's activities gave rise to probable cause to believe that he was transporting contraband. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); United States v. Falley, 489 F.2d

*Severance*

■ Defendants Capra, Jermain, Morris and Harris requested severances below on the ground that the evidence failed to prove a single conspiracy. They argued that the prosecution actually revealed multiple conspiracies, which should have been tried separately. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

The trial court properly denied these motions. When a continuing, chain-relationship between the defendants as importers, distributors, and sellers is proven, see United States v. Sisca, 503 F.2d 1337 (2 Cir. 1974); United States v. Rizzo, 491 F.2d 215 (2 Cir. 1974); United States v. Bynum, 485 F.2d 490 (2 Cir. 1973), and where the evidence against the particular defendants who request severance is not "so little or so 'vastly disproportionate' " in comparison to that admitted against the remainder of the defendants, United States v. Rizzo, *supra*, 491 F.2d at 218, severance is not required. The trial judge instructed the members of the jury not to consider evidence against any defendant once he had ceased to be a member of the conspiracy; this sufficiently protected the defendants under the circumstances of this case.

The remaining claims raised by the defendants do not have sufficient merit to require discussion.[13]

*Conclusion*

The judgments of conviction against Capra, Guarino and DellaCava on the first or conspiracy count are reversed because of the admission into evidence of the recordings and transcripts of the illegal electronic interceptions of their conversations and the testimony regarding the resulting police surveillance of their activities. *Giordano, supra.*

■ Because they were not parties to the intercepted calls, Jermain, Morris and Harris were not "aggrieved persons" within the meaning of 18 U.S.C. § 2518(10)(a); they, therefore, lacked standing at the trial to contest the admission of the evidence resulting from the electronic surveillance. 1968 U.S. Code Cong. & Admin.News p. 2185; Alderman v. United States, 394 U.S. 165, 175–176 n. 9, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441 (1963). "Coconspirators and codefendants have been accorded no special standing" to enforce the exclusionary rule. Alderman v. United States, *supra*, 394 U.S. at 172, 89 S.Ct. at 965. Their convictions on the conspiracy count are affirmed. Brown v. United States, supra, 411 U.S. 223 at 230, 93 S. Ct. 1565, 36 L.Ed.2d 208; United States v. Garcilaso de la Vega, 489 F.2d 761, 763 (2 Cir. 1974); United States v. Pui Kan Lam, supra, 483 F.2d at 1205; United States v. Solis, 469 F.2d 1113, 1114 n. 1 (5 Cir. 1972), cert. den. 410 U. S. 932, 93 S.Ct. 1375, 35 L.Ed.2d 594 (1973).

The record shows that none of the evidence resulting from the illegal wiretaps was used to prove the guilt of any of the defendants, Capra, Guarino, DellaCava and Jermain, on the substantive charges, Counts 2, 3, 4 and 5. All of the events relating to these four counts, and all of the relevant events encompassed in the counts, occurred prior to the installation of the wiretap; moreover Ramos' testimony on these charges was independently corroborated. There is no indication in the record nor was there a claim by any of the defendants that the police

33 (2 Cir. 1973); James v. United States, 135 U.S.App.D.C. 314, 418 F.2d 1150 (1969); United States v. Epstein, 240 F. Supp. 80 (S.D.N.Y.1965).

13. The motion by David Blackstone, Esq., attorney for the appellant George Harris, for leave to withdraw as assigned counsel is denied.

The motion by the Government for dismissal of the appeal by Harris is denied in view of the fact that the appeal has been heard and decided.

identified Ramos or asked him to testify as a result of evidence uncovered by the wiretaps. See Wong Sun v. United States, *supra*; *Giordano, supra.*

The judgments of conviction entered on Counts 2, 3, 4 and 5 against the defendants Capra, Guarino, DellaCava and Jermain are affirmed.

It is so ordered.