**UNITED STATES of America, Plaintiff,**

v.

**William Fillmore CROUCH, Defendant.**

**No. CR–87–0014 EFL.**

United States District Court,
N.D. California.

Aug. 11, 1987.

Leida Schoggen, Asst. U.S. Atty., San Francisco, Cal., for plaintiff.

Riordan & Rosenthall, San Francisco, Cal., for defendant.

## ORDER RE MOTION TO SUPPRESS

LYNCH, District Judge.

Defendant William Fillmore Crouch is charged with conspiracy to commit bank robbery, a violation of 18 U.S.C. section 371, and possession of a firearm after three previous violent felony convictions, a violation of 18 U.S.C. section 924(e). The evidence against Crouch was obtained through electronic surveillance utilized during the latter part of an eighteen-month effort to recapture Terry Conner and Joseph Dougherty. Defendant contends that the evidence obtained through the warrantless wire interceptions must be suppressed because no emergency situation, as defined by 18 U.S.C. section 2518(7), existed that

would permit law enforcement authorities to dispense with the requirement of prior judicial authorization of wire interceptions.

## I. FACTS

In June 1985, Joseph Dougherty was a defendant in a bank robbery trial in Oklahoma. When he called prison inmate Terry Conner as a witness, the pair escaped mid-trial. In July, August, and September they committed a series of violent bank robberies in which bank personnel and their families were held hostage. As a result of those crimes, the men were placed on the "Most Wanted" lists of both the United States Marshal and the Federal Bureau of Investigation.

Through a confidential informant, law enforcement authorities in Arizona learned that Robert Butcher had been in contact with Conner and Dougherty, and that the fugitives were planning another bank robbery. Through a physical surveillance of Butcher, the authorities learned that Conner and Dougherty were apparently using predesignated pay telephones to contact Butcher. Therefore, the Federal Bureau of Investigation applied for and received authority from the United States District Court in Arizona to intercept wire communications at specified pay telephones in Tuscon, Arizona. Several conversations between Butcher and Conner were intercepted pursuant to that order. Those conversations confirmed that the men were planning a future bank robbery at an unspecified location.

On November 20, 1986, the first emergency interception, pursuant to 18 U.S.C. section 2518(7), was authorized. Butcher, who was still under surveillance, apparently had begun communicating with Conner and Dougherty using pay telephones that were not included in the court-ordered wiretaps. "Because of the immediacy of the robbery plans and the fact that specific telephones which would be used could not be identified sufficiently early to obtain a wiretap order through the court in advance, the emergency authority was granted." Government's Response to Defendant's Motion to Suppress at 5. Information obtained through this interception was used as the basis for affidavits in support of subsequent emergency wiretaps. A series of emergency interceptions continued through December 1, 1986.

On December 1, Butcher placed two telephone calls to a San Francisco Bay area telephone number, but on each occasion he hung up before the call was completed. Agents from the F.B.I. learned that the number was assigned to Mae Roach, who lived at 1230 Craig Drive in Concord, California. An F.B.I. agent observed a car registered to the defendant parked in front of that address. Further investigation revealed that Crouch was on parole and had listed the Craig Drive residence and telephone number as his own with his parole officer.

In subsequent emergency interceptions of defendant's wire communications from the Craig Drive telephone number, as well as public pay telephones, F.B.I. agents learned that Crouch had been set up as a conduit for communications among Butcher, Conner, and Dougherty. Through surveillance and wire interceptions, Butcher, Conner, and Dougherty were traced to Chicago, where they were planning a bank robbery. Conner was arrested in Chicago. The agents later learned that Crouch and Butcher were planning another bank robbery in San Francisco. Ultimately, Crouch, Butcher, and Dougherty were all arrested in the San Francisco Bay area.

## II. DISCUSSION

Defendant claims that all communications intercepted pursuant to the emergency authorization of 18 U.S.C. section 2518(7), as well as the fruits of those interceptions, must be suppressed because no emergency existed that would justify a departure from the requirement of prior judicial authorization. The government argues that the emergency in this case was the allegedly imminent bank robbery.

The wire interception statutes, entitled the Omnibus Crime Control and Safe Streets Act of 1968, are codified at 18 U.S.C. sections 2510–2520. The broad legislative scheme sets forth strict require-

ments that the government must fulfill in order to obtain authorization to conduct lawful wire interceptions.

The emergency authorization section is a narrow exception to the general rule requiring prior judicial authorization of wire interceptions. Section 2518(7) provides that, in certain emergency situations, a law enforcement officer may intercept a wire communication if an application for an order approving the interception is made within forty-eight hours after the interception begins.

An emergency situation is statutorily defined as one that involves: "(i) immediate danger of death or serious physical injury to any person, (ii) conspiratorial activities threatening the national security interest, or (iii) conspiratorial activities characteristic of organized crime." 18 U.S.C. § 2518(7)(a) (1970). The government acknowledged at oral argument that the emergency in this case, if it existed at all, must meet the requirements of the first alternative, that is, the upcoming bank robbery must have posed an *immediate* danger of death or serious physical injury. The statute further states that an emergency must require a wire communication "to be intercepted before an order authorizing such interception can, with due diligence, be obtained." *Id.*

The government argues that, at the time of the first emergency authorization on November 20, the following factors created an emergency situation: (1) the suspects had a known violent criminal background; (2) the suspects were planning a bank robbery; (3) a confidential informant told law enforcement authorities that the robbery was planned to take place within sixty days from October 31, 1986; (4) the telephone contacts among the suspects were increasing in frequency; and (5) the suspects were discussing plans for Butcher to meet with Conner and Dougherty. This Court holds that those factors cannot support a finding that the government has met its burden of demonstrating an immediate danger of death or serious injury existed.

Very little case-law interpretation of the emergency requirement exists. One court,

in *Nabozny v. Marshall,* 781 F.2d 83 (6th Cir.1986), held that an emergency situation existed warranting retroactive judicial approval. The factual situation in that case, however, was far different from the facts of the instant case. In *Nabozny,* three men had kidnapped a bank manager and were in the process of attempting to extort money from the bank. The emergency in any case in which a hostage is being held by force or threat of force is clear. No such immediate danger of death or physical injury to a person was involved in this case.

The court in *United States v. Capra,* 501 F.2d 267 (2d Cir.1974) explained that "Congress had in mind by the use of the term 'emergency' an important event, limited in duration, which was likely to occur before a warrant could be obtained." *Id.* at 277 n. 8. The government argues that the language in *Capra* was merely dicta and that, although the court cites the statute's legislative history as support for its statement, the legislative history in fact does not support such an interpretation of the term emergency.

The Senate Report states that an emergency interception may be authorized "[w]here any investigative or law enforcement officer determines ... that an emergency situation exists that requires a wire or oral communication to be intercepted before an order authorizing an interception can with due diligence be obtained." 1968 U.S. Code Cong. & Admin. News 2112, 2193. The Report further notes that "[o]ften in criminal investigations a meeting will be set up and the place finally chosen almost simultaneously. Requiring a court order in these situations would be tantamount to failing to authorize the surveillance." *Id.*

The government argues that the situation presented to the law enforcement authorities in this case was closely analogous to the scenario set forth in the legislative history. However, to the extent that the above-quoted passage of the Senate Report ignores the requirement of an immediate danger of death or serious physical injury, or conspiratorial activities threatening national security interests or characteristic of

organized crime, it is inconsistent with the clear language of the statute itself and may not be relied upon by the government to support the emergency authorization in this case.

The government claimed in its brief and at oral argument that courts should not set outer time limits beyond which the threat of death or serious injury could not be termed immediate. *See* Government's Supplemental Brief in Support of Opposition to Defendant's Motion to Suppress at 8. ("The fact that the period of time was a matter of days rather than a matter of hours should not be determinitive of this court's decision.") In this Court's view, the statutory requirement of immediacy mandates the imposition of a time limitation.[1] The U.S. Attorney admitted, in response to questioning by this Court at oral argument, that if law enforcement agents knew the bank robbery were going to take place in eight days, then no emergency would exist. The statute's provision, that an emergency must require interception before judicial approval can be obtained with due diligence, seems to indicate that there must be evidence that the event causing the danger of death or injury will take place in two days at the very most. Under certain facts even that time period may not qualify as sufficiently immediate.

In the present case, the affidavits in support of the emergency wiretaps contain no evidence indicating that the bank robbery was going to happen immediately, or even within eight days. As of November 20, the date of the first emergency authorization, the authorities knew only that a confidential informant had stated twenty days ago, on October 31, that Dougherty and Conner were planning a "big job" within the next sixty days. They also knew, through a conversation between Conner and Butcher that was intercepted on November 9, 1986, that Dougherty was sick and Conner had been unable to discuss the plan for the bank robbery with him. These facts certainly cannot support a finding of an immediate danger of death or serious bodily injury.

Subsequent emergency authorizations relied on information revealed in the first improper emergency wiretap. Even if they had not been tainted by the first wiretap, the affidavits in support of the later emergency interceptions similarly fail to set forth facts demonstrating that the bank robbery was imminent. For example, on November 26, 1986, authorities intercepted a conversation between Conner and Butcher in which Conner reported: "I don't have the plan laid down ... we're still delayed a little bit. ... I need a few more days to get a plan laid out." On November 29, Conner told Butcher that it would be approximately ten days before they worked and that they still needed to make arrangements to obtain several vehicles.

At no point did the situation rise to the level of an imminent danger of serious injury or death. The intercepted conversations revealed that the bank robbery was still in the planning stage. In fact, Butcher, who was going to participate in the robbery, was in a different part of the country from the other suspects when the first emergency wiretaps were authorized. Congress, when it enacted the Omnibus Crime Control and Safe Streets Act of 1968, provided for what it perceived to be adequate safeguards of the right of the people to be free from unreasonable governmental intrusions into legitimate expectations of privacy. It carefully spelled out the judicial function of prior approval of electronic eavesdropping, except in certain narrowly defined emergency situations. An emergency must arise quickly and before there is time to seek judicial approval. The government's argument that an emergency exists any time that serious criminal activity is planned for some unspecified date in the future circumvents the narrow exception to the general requirement of

---

**1.** In fact, the simple dictionary definition of immediate is "1. occurring ... without delay; instant. 2. of or pertaining to the present time or moment. 3. following without a lapse of time. ..." *The Random House College Dictionary* 664 (rev. ed. 1982).

prior judicial approval carved out in section 2518(7).[2]

Therefore, because no emergency situation existed on November 20 or thereafter, evidence obtained through those wiretaps must be excluded. As the government admits, once evidence obtained through emergency interceptions is excluded, no probable cause existed to tap defendant's home telephone or the pay telephones that he used. Accordingly, evidence obtained through those wiretaps is also suppressed.

IT IS SO ORDERED.

**2.** The real reason that law enforcement authorities resorted to the emergency authorization procedures in this case appears to this Court to be that the authorities could not get prior judicial approval for the interceptions because they could not specify in advance which pay telephones the suspects would use. Although they were faced with the prospect of not being able to intercept the conversations at all if they did not use the emergency authorization procedure, this clearly was not an emergency situation as defined by section 2518(7). In 1986, Congress amended the wiretap statutes to add a provision stating that law enforcement authorities need not specify the place where the communication is to be intercepted if such specification is not practical because the suspect is attempting to thwart interception by changing facilities. 18 U.S.C. § 2518(11) (Supp.1987). The "roving wiretap" procedure was not available to the authorities in this case because it was enacted after the wiretaps were conducted. Obviously, if this situation previously had been covered by the emergency authorization section, the amendment would have been unnecessary.