UNITED STATES of America,

v.

George OCHS, a/k/a "George the Ox," Defendant.

No. 77 Cr. 775.

United States District Court,
S. D. New York.

Memorandum Jan. 11, 1978.

Opinion April 7, 1978.

Robert B. Fiske, Jr., U. S. Atty., S.D. N.Y., New York City, for United States; Peter D. Sudler, Asst. U. S. Atty., New York City, of counsel.

Robert Blossner, New York City, for defendant; Robert Blossner, Arnold E. Wallach, New York City, of counsel.

## MEMORANDUM

IRVING BEN COOPER, District Judge.

The defendant moves pursuant to Rules 41(f) and 12(b), Federal Rules of Criminal Procedure, to suppress the contents of two briefcases seized and searched on September 5, 1975 by the New York City Police. After a full hearing before us on December 13 and 20, 1977, the within motion is hereby denied in its entirety.

Our ruling is predicated primarily on the following succinct recital: (1) The defendant has standing to contest the admissibility of the seized articles on the basis of Fourth Amendment safeguards. See, e. g., *Mancusi v. DeForte,* 392 U.S. 364, 368, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). (2) There was probable cause to arrest the defendant. See, e. g., *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1948); N.Y.Crim.Proc.L. § 140.10 (McKinney 1971) (warrantless arrest). (3) The impounding

of the car was proper under standard New York City Police Department procedures. See, e. g., *People v. Kern,* 67 Misc.2d 495, 324 N.Y.S.2d 442 (1971). (4) The inventory search of the car and briefcases was lawful. See, e. g., *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).

We plan to file a more detailed memorandum decision disposing of these and other issues presented.

## OPINION

We found credible the evidence adduced by the Government at the open hearing we conducted on the defendant's application to suppress certain extremely vital evidence which came into the hands of the police after defendant Ochs was placed under arrest. The nature of this motion before us is such that we undertake[1] a somewhat detailed factual recital of what took place at the hearing.

While cruising in a patrol car on September 5, 1975 at approximately 4:30 P. M. in the vicinity of a department store, B. Altman & Company, Fifth Avenue and 35th Street, Manhattan, New York City, Police Officers John O'Malley (on the force 8½ years) and William Kelly were signaled to stop by Mr. Theodore Bielefeld, the assistant director of security of the store. He imparted to them right then and there information that proved to have a direct bearing on the issue of probable cause for the subsequent arrest of Ochs. We should promptly point out that he was well known to the officers. They had dealt with him in his official capacity as assistant security director of B. Altman. On over a dozen prior occasions Officers O'Malley and Kelly had arrested individuals in B. Altman for a variety of offenses including shoplifting, forgery, and burglary solely on information supplied to them by Mr. Bielefeld. All arrests made upon information provided by

Mr. Bielefeld have been upheld by the New York State Courts. Mr. Bielefeld is himself a retired New York City police officer.

Bielefeld informed the officers that a ring of three male persons engaged in check-cashing stolen traveler's checks of the American Express Company had just passed such checks in the store; that two of them were then seated in a blue Cadillac automobile parked on East 35th Street (between Fifth and Madison Avenues) and the third, known to Bielefeld as Julian Mitchell,[2] was no longer in sight; that merchandise which had been purchased by Mitchell and members of his ring the day before was brought there for refund by Ochs the very next day (September 5) at about 4:00 P. M.; that Ochs entered the store, proceeded to the refund counter with the apparent intent of making a refund for cash. Perhaps because he was being followed by Bielefeld, Ochs became apprehensive and exited the store with the package without having received a refund.

Bielefeld also related he had followed defendant out of the Fifth Avenue door of the store and observed him walk in a northerly direction on that street. Ochs disappeared into a doorway on the east side of Fifth Avenue between 35th and 36th streets at which time Mr. Bielefeld flagged down Officers O'Malley and Kelly in their patrol car. Ochs then approached a dark blue, 1975 Fleetwood Cadillac (New York license no. 634–WFL) and entered that car which was parked on East 35th Street facing west.

Bielefeld showed O'Malley photostatic copies of the stolen American Express checks in the name of O. Grable that were cashed in the store the day before; also a photostatic picture of Mitchell.

The officers requested Bielefeld to see if the persons he mentioned were still in the automobile; he looked and reported affirmatively. The officers then pulled their pa-

[1] With substantial help from the Government's (Assistant United States Attorney Sudler) memorandum.

[2] Mitchell has an extensive prior criminal history of illicit activity of this kind and was well known to the security personnel at B. Altman, as well as the New York City Police.

trol car in front of the Cadillac so as to preclude exit. They approached the automobile, O'Malley on the driver's side where Ochs sat, Kelly on the passenger's side (front) where one Liveo[3] was seated. Weapons were not drawn. When O'Malley first saw Ochs, he perceived that he fitted the description (furnished him by Bielefeld) of the man who attempted to obtain a refund on stolen merchandise that day.

Less than a minute thereafter, O'Malley observed the blade of an open knife on the front seat between Ochs and Liveo. O'Malley yelled that information to Kelly. One of them took the knife and upon its examination, by the officers right then and there, were satisfied that it was a gravity knife. Both knew it was a violation of New York State law to possess such an instrument open or closed.[4] The knife had a six inch handle that accommodated a sharp blade about that size. A gravity knife differs from a penknife in that by depressing its button, accompanied by a flicking of the wrist, the blade exits the handle and locks into place. It can be opened and remain so without touching the lock. It is somewhat similar to a push-button switchblade knife without however the latter's spring to force the blade open; the force of gravity, and not a spring, forces the blade open and ends in a locked position.

Satisfied it was a gravity knife, the officers ordered Ochs and Liveo out of the car and directed them to place their hands on the roof of the car. At first Ochs and Liveo resisted the instructions and became belligerent. They soon changed their attitude. The officers frisked them but found nothing relevant to the search.

As O'Malley frisked Liveo down and reached his ankles, he noticed a black object on the left front wheel well floor. His first impression of it was a gun or weapon. He asked Liveo about it and received a negative answer. Thereupon, O'Malley reached in and took possession of an object that turned out to be a folded leather book of American Express traveler checks in the name of O. Grable, identical to the ones which had been used by Mitchell to purchase goods at Altman's on September 4 and 5, 1975.

During the next two minutes, the two were given their constitutional rights and the officers questioned Ochs about the ownership of the automobile; defendant responded it belonged to a friend whose whereabouts then he did not know. When asked, Ochs produced a New York State driver's license in his own name and a registration certificate for the vehicle in the name of Otto Narday. O'Malley noticed that the upper portion of the registration certificate had been tampered with, a "7" changed to an "f."

From Narday we learned that the car belonged to him. On frequent occasions he had borrowed from Ochs substantial sums (at one time $18,000; presently $12,000). On occasion Narday had difficulty paying defendant back. He had not "yet" transferred to Ochs the ownership of the car.

Since neither occupant was the owner, the registration certificate had been altered, neither occupant knew where the owner could then be located, the gravity knife on the front seat, and Ochs fitted the description given by Bielefeld of the man who was a member of the stolen check-passing ring—all these factors gave the officers the impression that they were looking at a stolen car.

O'Malley tried to verify by radio the car's legal status,[5] but static interfered and pre-

---

**3.** Louis Liveo was later named as a co-defendant in a state criminal action arising out of this arrest.

**4.** New York Penal Law § 265.00(5) defines a gravity knife as ". . . any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force which, when released, is locked in place by means of a

button, spring, lever or other device." Possession of a gravity knife by any person who has previously been convicted of any crime is a class C felony. § 265.02(1). Ochs had five prior convictions at the time of his arrest.

**5.** Such information is readily available to police officers through the National Crime Information Computer.

vented contact with the communications bureau. He succeeded in getting another police unit to attend; whereupon Ochs and Liveo were arrested, handcuffed and removed to the Midtown South station house. At no time on the way to the precinct did either man claim ownership of the property in the car; neither requested the officers not to examine or take possession of whatever was there.

Before leaving the scene of the arrest, O'Malley requested one of the policemen to transport the blue Cadillac to the precinct where it was "vouchered"[6] and an inventory made of the items in it. The police procedure that prevailed at the time made it imperative that a police officer remove and impound[7] any automobile believed stolen and conduct an inventory search of all cars seized or illegally parked. This is done for the owner's safe-keeping as well as affording protection of the police department against false claims of missing property of any kind, also to determine the existence of explosives or weapons.

Ochs and Liveo were placed in the detention cell promptly. Approximately five to ten minutes later, O'Malley and Kelly left to search the vehicle and make an inventory of its contents. Among other things, the search yielded a .32 caliber starter's pistol, a simulated revolver, a scanning receiver (a device used to listen to police radio transmissions), one B. Altman's sweater, originally purchased with stolen traveler's checks by Mitchell on that day, a second book of stolen traveler's checks and two briefcases. The blue Cadillac itself was also vouchered along with the knife and the stolen traveler's checks seized during the arrest. The briefcases unlocked were found in the footwells of the back seat.

The briefcases were examined by the officers a few feet from where Ochs stood and in a position to observe the inspection. He engaged in small talk that included, "What do you guys think you're going to find?" The contents of the briefcases were carefully inventoried. O'Malley made sure they contained nothing harmful, i. e., a bomb, gun, other weapon, etc. Four bank books were found and listed, one listed this defendant as co-owner, the other three bore names other than defendant. Also removed were numerous sheets of paper, records and two small address books. No valuables, money, jewelry, securities were found.

Numerous entries filled the sheets and records; they related both to Studio 1 Massage Parlor and a money-loaning enterprise. O'Malley immediately recognized the parlor, for official business had brought him there on at least two occasions prior to September 5, 1975, the date of defendant's arrest in the instant case. It was, he was positive, an active house of prostitution. Entries on the paper sheets included names of girls and fees paid to the house. Other entries led O'Malley to conclude they related to "loan sharking" i. e., "old loan, new loan, paid, to be paid, that type deal," he testified.

On the arraignment (the day following) in state court of Ochs for possession of the gravity knife, he said to the officer, "What's this all about loan-sharking . . . so I lend money to people. What's wrong with that?"

On September 24, 1975 Ochs was arraigned in federal court. Defendant's attorney there approached O'Malley and offered a bribe. He reported the incident to his superiors. Officers O'Malley and Kelly thereupon began a three-month undercover

---

6. Vouchering, or the invoicing of property coming into police custody, is a standard police department procedure. See N.Y.P.D. Patrol Guide, Procedure No. 113–1 and 113–3. See also N.Y.P.D. Legal Division Bulletin, Vol. 1, No. 20 concerning the seizure of contraband from an automobile during an inventory of such automobile's contents.

7. The impoundment of a vehicle in which a dangerous weapon is found is standard New York Police Department procedure. Additionally, the officers had probable cause to believe that the car was stolen and that it had been used for the commission of a crime. They were also concerned about the unknown whereabouts of Julian Mitchell and his associates who might return and remove the car and its contents. Furthermore the officers could not leave the car where it was because it would constitute a traffic hazard. The car was illegally parked on a busy street during rush hour.

investigation which culminated in the arrest of the attorney and the rearrest of Ochs and Liveo on charges of bribery, conspiracy and obstruction of justice.

During this bribery investigation, Ochs paid O'Malley and Kelly $5,150.00 in return for which he demanded that the officers commit perjury by testifying to the events surrounding the inventory search of the blue Cadillac on September 5, 1975 in such a fashion that the search would be deemed illegal and in violation of his fourth amendment rights, thus causing the Court to suppress any evidence derived from that search. These conversations with Ochs were recorded and form the basis for the state charges of bribery, conspiracy, and obstruction which are presently pending against him in the Supreme Court of New York.

### Procedure Applicable

Federal law governs the legal issues here presented. In *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), a defendant in a federal criminal action sought to suppress certain evidence claiming that it was obtained when state police officers violated his fourth amendment rights. The Supreme Court considered whether state or federal law was applicable to defendant's constitutional claims:

"The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." 364 U.S. at 224, 80 S.Ct. at 1447.

*Accord, United States v. Bedford*, 519 F.2d 650 (3d Cir. 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed. 323 (1976); *United States v. Burke*, 517 F.2d 377 (2d Cir. 1975); *United States v. Scolnick*, 392 F.2d 320 (2d Cir.), *cert. denied sub nom., Brooks v. United States*, 392 U.S. 931, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968); *Preston v. United States*, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); *cf. Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975).

At the conclusion of the hearing on December 20, 1977, the defendant had still not satisfied his burden of showing that he had standing to make his motion to suppress the books and records seized by police officers during an inventory search of the car he was driving on September 5, 1975. The defendant could have easily satisfied this burden by submitting a simple possessory affidavit. This affidavit could not be used against him at trial. *Simmons v. United States*, 390 U.S. 377, 389–94, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

Instead the defendant has cited to the Court numerous cases in which a defendant has been held to have "automatic standing" where possession of the fruits of a search were part of the elements of the crime charged. See, e. g., *Jones v. United States*, 362 U.S. 257, 263, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Such is not the case here because Ochs is not charged with possession of loansharking or prostitution records. Rather the focus of the question must be whether Ochs has "actual standing" to contest the search of which he complains. In this regard it is settled that the fourth amendment's prohibition against unreasonable searches and seizures protects a person's reasonable expectation of privacy from arbitrary official invasion, *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Camara v. Municipal Ct.*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); and only a person whose reasonable expectation of privacy has been invaded has standing to move to suppress any evidence seized as a result of the invasion. As stated in *Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960):

In order to qualify as a "person aggrieved by an unlawful search and seizure" one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else.

*Accord, Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

Stated somewhat differently, standing depends upon a defendant's having a relationship to, or interest in, either the premises searched or the property seized sufficient to warrant a finding that he was "a victim of a search or seizure."

■ A person's standing to suppress evidence does not depend upon whether he has a property right in the invaded premises "but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion." *Mancusi v. DeForte,* 392 U.S. 364, 368, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968). *Accord, Combs v. United States,* 408 U.S. 224, 92 S.Ct. 2284, 33 L.Ed.2d 308 (1972); *Katz v. United States,* 389 U.S. 347, 352–53, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■ We uphold the Government's position that Ochs who had borrowed the blue Cadillac from Otto Narday, one of his loan-shark victims (at one time he was $18,000 in debt to Ochs), did not have a reasonable expectation of privacy in the premises of the borrowed Cadillac. See, *United States ex rel. Laws v. Yeager,* 448 F.2d 74, 85 (3d Cir. 1971), *cert. denied,* 405 U.S. 976, 92 S.Ct. 1201, 31 L.Ed.2d 251 (1972) (occasional borrower of car used in robbery lacks standing); *United States v. Graham,* 391 F.2d 439 (6th Cir.), *cert. denied,* 393 U.S. 941, 89 S.Ct. 307, 21 L.Ed.2d 278 (1968) (no standing where car is in possession of another allegedly connected with same crime).

Given the testimony of Otto Narday it is probable that the Cadillac was taken by Ochs when Narday was unable to meet payments on loans from the defendant. Further, the automobile was used by Ochs for the commission of a crime and thus he had even less of an expectation of privacy in its premises.

It is questionable whether Ochs had standing to suppress the items seized during the inventory search.

### Evidentiary Rules

■ The evidentiary rules at a suppression hearing are not applied with the same force which they command at trials.

The Government has the burden of proving "by a preponderance of the evidence" that the search and seizure material is admissible at trial. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). *See Lego v. Twomey,* 404 U.S. 477, 487–89, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). In meeting that burden, Rule 1101(d)(1) of the Federal Rules of Evidence provides that those rules do not apply to the determination of questions of fact preliminary to the admission of evidence, and Rule 104(a) provides that a court in making such a determination is not bound by the rules of evidence except those with respect to privileges. Consequently, there is no automatic rule against receiving hearsay evidence in suppression hearings where the trial court itself can accord that evidence such weight deemed desirable. *See United States v. Matlock, supra.* In *Matlock,* the Court held that the trial judge, who in considering the validity of a third-party consent, had erred in excluding police testimony about the consenting party's extrajudicial statements as to her cohabitation with the defendant-owner of the premises searched, where these statements were consistent with each other, corroborated by other evidence, and made without malice and against her own penal interest. See *United States v. Cirillo,* 499 F.2d 872 (2d Cir.), *cert. denied,* 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974) (need for suppression hearing).

### The Search of the Automobile Was Proper

■ The police officer had probable cause to arrest Ochs on three distinct charges. First, we have the information given to the officers by Mr. Bielefeld that Ochs was part of a ring of individuals who were purchasing merchandise in B. Altman with stolen traveler's checks and then refunding that merchandise for cash. Secondly, the officer had probable cause to arrest him for possession of a dangerous weapon (the open gravity knife) which they observed when they approached the blue Cadillac. Thirdly, there was probable cause to arrest defendant for car theft when he was unable to prove ownership of the Cadillac and produced a bogus registration.

Under these circumstances, the police officers had no choice but to arrest the defendant, after which there were several reasons why the police officers were required to retain custody of the automobile wherein he was seated shortly before the arrest.

First, that vehicle had been utilized by Ochs, Julian Mitchell, Louis Liveo and others unknown for the commission of a crime, and thus the officer had the duty to seize it. The defendant could have been charged at that point with the Criminal Possession of Stolen Property; Forgery; Possession and Uttering of Forged Instruments. See New York Penal Law. These violations, all of which were felonies, required that he be held for recording, fingerprinting and other preliminary police duties, New York Criminal Procedure Law § 140.-20(1), (5) (McKinney 1971). Since the car could not be left illegally parked on the well-travelled street during rush hour, while the defendant was being booked, it was necessary that it be brought into police custody and, therefore, be inventoried for the reasons set out below.

Secondly, the vehicle had been used to transport a dangerous weapon, a gravity knife, which provided yet another independent ground for the seizure. Thirdly, and most significantly, Ochs was unable to produce a valid registration reflecting his ownership of the blue Cadillac; instead, he produced a tampered registration certificate in the name of Otto Narday. Under these circumstances, the officers had probable cause to believe the car stolen and thus had the duty to verify their belief. Because their radio was not working in that area, they had to remove the car to the police precinct. Furthermore, the car was illegally parked and constituted a traffic hazard. Under these circumstances, the seizure of the vehicle and its attendant inventory search were mandated.

The purpose of such an inventory search, as recently explained by the Supreme Court, is three-fold: (1) to protect the items for the owner; (2) to protect the police against liability from claims of items being stolen; (3) to protect the public from dangerous instrumentalities which may be stored in the car. *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). These policies have been recognized by both the Supreme Court and the Circuit Courts on several occasions as both reasonable and not inconsistent with the defendant's constitutional guarantees under the fourth amendment. *Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975); *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); *Cabbler v. Superintendent,* 528 F.2d 1142 (4th Cir. 1975), cert. denied, 429 U.S. 817, 97 S.Ct. 60, 50 L.Ed.2d 77 (1976); *Barker v. Johnson,* 484 F.2d 941 (6th Cir. 1973); *United States v. Gravitt,* 484 F.2d 375 (5th Cir. 1973), cert. denied, 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 761 (1974); *United States v. Mitchell,* 458 F.2d 960 (9th Cir. 1972).

In *Opperman,* the police conducted an inventory search of a car impounded for multiple parking violations. Marihuana was discovered in the glove compartment; the use of it as evidence in a subsequent prosecution for possession of a controlled substance was upheld. Pointing up the well-established distinction between searches of homes and automobiles, the Supreme Court stated:

> Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office.

> \*   \*   \*   \*   \*   \*

> Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements.

> \*   \*   \*   \*   \*   \*

In the interests of public safety and as part of what the Court has called "community caretaking functions," *Cady v. Dombrowski, supra,* [413 U.S.] at 441, [93 S.Ct. at 2528] automobiles are frequently

taken into police custody. Vehicle accidents present one such occasion.

\*    \*    \*    \*    \*    \*

Police will also frequently remove and impound automobiles which violate ordinances and which thereby jeopardize both public safety and the efficient movement of vehicular traffic. *The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.*
[T]his court has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents. . . .

. . . We conclude that in following standard police procedures, prevailing throughout the country and approved by the overwhelming majority of the courts, the conduct of the police was not "unreasonable" under the Fourth Amendment. 428 U.S. at 365–67, 96 S.Ct. at 3096 (emphasis added).

The standard New York City police procedure used in searching the automobile is substantially the same used throughout the country; certainly the same approved in *Opperman. Compare People v. Sullivan,* 29 N.Y.S.2d 69, 73, 323 N.Y.S.2d 945, 272 N.E.2d 464 (1971) (wherein a description of New York City Police Dept. Procedures is given) with cases cited in *South Dakota v. Opperman,* 428 U.S. at 366, 96 S.Ct. 3092; see, e. g., *United States v. Pennington,* 441 F.2d 249 (5th Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 97, 30 L.Ed.2d 94 (1971); *State v. Tully,* 166 Conn. 126, 348 A.2d 603, 609 (1974); *People v. Trusty,* 183 Colo. 291, 516 P.2d 423, 425–26 (1973).

*People v. Kern,* 67 Misc.2d 495, 324 N.Y. S.2d 442 (1971) contains a factual similarity with what confronts us here. In *Kern,* the defendant was legally arrested while sitting in his car on charges other than possession of stolen property. He and his car were taken to the stationhouse. While defendant was being booked, one of the arresting officers went out to "voucher" the car and its contents. Using the keys which had been left in the ignition, he opened the trunk and there saw several items of stolen office machinery. Defendant moved to suppress the machinery for use as evidence against him on the ground that it was obtained by an illegal search. His motion was denied by the Court:

"Obviously, the police could not arrest defendant and leave his car unattended on the street. They were obliged by departmental regulation to hold the car and 'voucher' its contents in order to safeguard them. Rules & Procedures of the Police Department, chapter 24, Sec. 54.0. See *People v. Granese,* 32 A.D.2d 568, 300 N.Y.S.2d 215 (2d Dept.1969) (mem.) (dissenting opinion). The search of the car was reasonably related to compliance with that regulation. When he opened the trunk, the officer was neither seeking evidence against defendant nor doing more than what is minimally necessary to (voucher) the car's contents. Accordingly, as *Cooper* and *Sullivan* tell us, the search was justified without reference to the arrest or to probable cause. (I should note that this case is a *fortiori* to *Sullivan.* There, the police found a briefcase in the car and opened it. In short, they searched both the car and the briefcase. Here, they merely opened the trunk and saw the stolen property in plain view. In short, they searched only the car.)" *Id.* 324 N.Y.S.2d at 445.

It seems clear to us that the search of the blue Cadillac was conducted for valid inventory purposes and thus any fruits of that search are admissible against Ochs.

### The Automobile Was Subject to Forfeiture Under New York Law

Because there was probable cause to believe that the blue Cadillac was stolen, that vehicle was subject to immediate seizure under Section 424(3) of the New York Vehicle and Traffic Law. Under these circumstances and whenever the police are required to maintain custody of a car for an indefinite period, whether because it was impounded or seized subject to a forfeiture

statute, the car must be searched in order to insure the safety of the property within, as well as to protect society from dangerous instrumentalities. In *Cooper v. California,* 386 U.S. 58, 61–62, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), the Supreme Court concluded:

> [i]t would be unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it. It is no answer to say that the police could have obtained a search warrant, for "[T]he relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable." *United States v. Rabinowitz,* 339 U.S. 56, 66, 70 S.Ct. 430, 435, 94 L.Ed. 653 . . . [W]e cannot hold unreasonable under the Fourth Amendment the examination or search of a car validly held by officers for use as evidence in a forfeiture proceeding.

*Cooper,* as well as several Second Circuit cases, see *United States v. Zaicek,* 519 F.2d 412 (2d Cir. 1975); *United States v. La Vecchia,* 513 F.2d 1210 (2d Cir. 1975); *United States v. Capra,* 501 F.2d 267 (2d Cir. 1974), *cert. denied,* 420 U.S. 990, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975), have distinguished the police department's interest in a car seized pursuant to a forfeiture statute from its interest in a car taken into custody at the time of an arrest solely for an unrelated crime. In *Zaicek,* the Court held that when the car is seized pursuant to a forfeiture statute, the police have "a greater possessory interest in the car than the owner." *Zaicek, supra,* 519 F.2d at 414.

■ Thus, the police have a possessory, as well as an evidentiary interest in the car. These interests were found in *Capra, supra,* to allow a more thorough search than a perfunctory inventory search made of any car taken into police custody. The police in *Capra* claimed they had performed a routine inventory search, but the Court found this claim inconsistent with their search which was clearly directed toward discovering incriminating evidence. Nevertheless, the Court approved the search, stating:

> [i]f agents have probable cause to believe that a car is or has been used for carrying contraband, they may summarily seize it . . . and search it.
> [citations omitted]

*Id.,* 501 F.2d at 280.

Since at the time of his arrest, Ochs had no proof of ownership of the blue Cadillac (indeed had supplied to police officers what appeared to be an altered registration certificate in the name of Otto Narday), the police had probable cause to believe the car was stolen.

The New York legislature has provided that a policeman "shall have power to seize any motor vehicle . . . in the state where there is good reason to believe that such motor vehicle . . . has been stolen . . . ." New York Vehicle & Traffic Law § 424(3) (McKinney 1970). The Second Circuit on numerous occasions has interpreted this statute to imply:

> that once the police have properly seized a car pursuant to a statute because they have reasonable grounds for believing it has been stolen, they have the authority to search the car without a warrant.

*Zaicek, supra,* 519 F.2d at 415. See also *United States v. Ortega,* 471 F.2d 1350 (2d Cir.), *cert. denied,* 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973); *United States v. Ayers,* 426 F.2d 524 (2d Cir.), *cert. denied,* 400 U.S. 842, 91 S.Ct. 85, 27 L.Ed.2d 78 (1970); *United States v. Francolino,* 367 F.2d 1013, 1018–23 (2d Cir. 1966), *cert. denied,* 386 U.S. 960, 87 S.Ct. 1020, 18 L.Ed.2d 110 (1967).

### The Search of the Two Briefcases Was Clearly Lawful

■ It is a fundamental proposition of law that a reasonable search conducted without a warrant and incident to a lawful arrest does not offend the fourth amendment to the Constitution and that a search incident to an arrest may extend to things within the immediate control of the accused. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). In this case, the two briefcases,

 

the search of which Ochs challenges, were obviously within his control at the time of arrest and within easy reach.

In the past, this Court has applied a rule that a search that is purportedly lawful because it is incident to an arrest must be conducted substantially contemporaneous with the arrest. *United States ex rel. Muhammad v. Mancusi,* 432 F.2d 1046 (2d Cir. 1970), *cert. denied,* 402 U.S. 911, 91 S.Ct. 1391, 28 L.Ed.2d 653 (1971).

In *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), the Supreme Court eliminated such a requirement and held a search was lawful as incident to arrest even though it was conducted many hours after the accused was arrested. However, even under the rule that the search must be substantially contemporaneous with the arrest, the Second Circuit (and numerous other United States Circuit Courts of Appeals) have made it clear that the search need not occur at the exact time and place of arrest. *United States ex rel. Muhammad v. Mancusi, supra; United States v. Frankenberry,* 387 F.2d 337 (2d Cir. 1967); *United States v. Miles,* 413 F.2d 34 (3d Cir. 1969); *Morris v. Boles,* 386 F.2d 395 (4th Cir. 1967), *cert. denied,* 390 U.S. 1043, 88 S.Ct. 1640, 20 L.Ed.2d 304 (1968); *United States v. Moore,* 477 F.2d 538 (5th Cir. 1973); *Leffler v. United States,* 409 F.2d 44, 48 (8th Cir. 1969); *Cotton v. United States,* 371 F.2d 385 (9th Cir. 1967); *Malone v. Crouse,* 380 F.2d 741 (10th Cir. 1967), *cert. denied,* 390 U.S. 968, 88 S.Ct. 1082, 19 L.Ed.2d 1174 (1968).

In *United States ex rel. Muhammad v. Mancusi, supra,* the Second Circuit in applying the substantially contemporaneous rule, held that a search of a briefcase[8] of the accused, that would have been lawful at the spot of arrest, was just as lawful when done shortly after the arrest at FBI headquarters.

---

8. The recent Supreme Court case of *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed. 538 (1977) has no bearing on this case. The Second Circuit has already held that *Chadwick* is not to be applied retroactively. See

 In this case, it made eminent sense for the police officers to wait to search the suitcase until they arrived at their headquarters.

Under these circumstances, it is clear under both the standard set forth in the *Mancusi* case and the recent ruling of the Supreme Court in *United States v. Edwards, supra,* that the search of the two briefcases at the Midtown South Precinct and seizure of the books and records therein were proper as incident to the arrest of this defendant.

### Conclusion

Ochs' suppression motion is denied in its entirety.

SO ORDERED:

*United States v. Reda,* 563 F.2d 510 (2d Cir. 1977) (on rehearing). The events of this inventory search preceded by almost two years the decision in *Chadwick.*