**UNITED STATES of America,**

v.

**Thomas M. RITTWEGER, Douglas C. Brandon, Robert S. Dehaven and Victor M. Wexler, a/k/a "Fat Boy", a/k/a "Screw", Defendants.**

**No. 02 CR. 122(JGK).**

United States District Court, S.D. New York.

April 23, 2003.

### OPINION AND ORDER

KOELTL, District Judge.

The defendants in this case—Thomas M. Rittweger ("Rittweger"), Douglas C. Brandon ("Brandon"), Robert S. DeHaven ("DeHaven") and Victor M. Wexler ("Wexler")—were charged in a thirteen-count indictment on January 31, 2002. The Grand Jury returned a superseding indictment on April 9, 2003 ("the Indictment").[1] The Indictment charges the defendants with offenses including conspiracy as well as various substantive crimes.

■■■ Defendants Rittweger, DeHaven, and Wexler (the "moving defendants") now move to suppress certain recordings of DeHaven's telephone conversations (the "Mitsui tapes") which were recorded by his employer Mitsui Trust Company (U.S.A.) ("Mitsui Trust"). The moving defendants argue that the tapes should be suppressed pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), as amended, 18 U.S.C. §§ 2510–2521, because they were reviewed in violation of Title III.[2] The Government argues that the tapes are admissible under

---

1. The motions filed by the defendants were addressed to the original indictment. However, the Court will apply these motions to the superseding indictment subsequently returned by the Grand Jury.

2. Rittweger raises several issues for the first time in his reply brief that can be dismissed at the outset. Rittweger argues that the Mitsui tapes must be suppressed because they are incomplete and untrustworthy. However, the Second Circuit Court of Appeals has expressed "a clear preference for the admission of recordings notwithstanding some ambiguity or inaudibility, as long as the recordings are probative." *United States v. Arango–Cor-*

*rea,* 851 F.2d 54, 58 (2d Cir.1988). There is no showing that the Mitsui Tapes are sufficiently ambiguous or inaudible so that the recordings are untrustworthy. Moreover, the probative value of the tapes is not outweighed by a danger of unfair prejudice in violation of Rule 403 of the Federal Rules of Evidence. Indeed, Rittweger has not asked the Court to listen to the audibility of the tapes. The only tape played at the evidentiary hearing was played by the Government and it was very clear and audible. Moreover, Rittweger's argument that the tapes are not relevant because they were recorded after the conspiracy was allegedly formed is without merit. The tapes are clearly probative as to the existence

any one of the three different exceptions to Title III: a "clean hands" exception, a "business purpose exception", or consent.[3] The Court held an evidentiary hearing on the motion on April 15–16, 2003. After considering all of the evidence the Court makes the following findings of fact.[4]

## I.

DeHaven worked at Mitsui Trust Company (U.S.A.) ("Mitsui Trust") from September 1991 through October 2000 as a Vice President in the Securities Lending Department where his responsibilities included conducting securities transactions over the telephone. (Affidavit of Michelle S. Kim sworn Mar. 13, 2003 ("Kim Aff.") ¶ 4.) Mitsui Trust conducted trust operations, custody, and securities lending operations, among other things. (Transcript of April 15–16 Hearing ("Tr.") at 8.) Also located in New York was Mitsui Banking Company ("the New York Branch") which conducted loan and trading operations, foreign exchange, futures, and options. (Tr. at 8.)

Throughout DeHaven's time at Mitsui Trust, his calls were automatically recorded in accordance with a company policy to record all telephone calls made by employees involved in trading activities. (Affidavit of Jeremiah E. Dunne sworn Mar. 2003 ("Dunne Aff.") ¶ 2; Kim Aff. ¶¶ 6–7.) The primary purpose of the recordings was to preserve a record for use in resolving any disputes about the terms of transactions negotiated over the telephone. (Dunne

Aff. ¶ 3; Kim Aff. ¶ 8; Affidavit of Stuart Bricker sworn Mar. 12, 2003 ("Bricker Aff.") ¶ 2.) Several witnesses testified credibly that it is standard industry practice in the financial services industry to record conversations on telephone lines on which financial transactions are negotiated and discussed. (Bricker Aff. ¶ 5; Dunne Aff. ¶ 3; Kim Aff. ¶ 8; Tr. at 101, 302.)

By August 1997, Mitsui Trust began using a Racal telephone recording system to record phone calls. (Dunne Aff. ¶ 4.; Tr. at 233, 250.) Mitsui Trust purchased the system directly from Racal. (Dunne Aff. ¶ 4.) The Racal system consisted of a 64–track machine that recorded on digital audio tapes ("DATs") and was connected directly to the telephone facilities provided by the telephone service provider. (Dunne Aff. ¶ 4; Tr. at 304, 308.) The system recorded both incoming and outgoing calls on lines in the Mitsui Trust trading room, including all lines for the securities lending area. (Dunne Aff. ¶ 4; Tr. at 178, 234.) This included DeHaven's telephone lines. (Dunne Aff. ¶ 4.) The tapes were used by traders or support personnel who needed to check a discrepancy in the settlement of a transaction, for internal audits, and during two internal investigations discussed below. (Tr. at 238–39, 245.)

In 1997, Stuart Bricker ("Bricker"), an internal auditor at Mitsui Trust, (Tr. at 100), conducted an audit of the Securities Lending Department. (Tr. at 105–06.) Bricker testified that during the audit he

of the alleged conspiracy and the co-conspirators' respective roles in the alleged conspiracy.

**3.** The moving defendants have also moved to suppress the tapes pursuant to New York State law. This argument is not developed by the defendants and they have not responded to the arguments raised by the Government in opposition. In any event, evidence in a federal criminal case may not be suppressed on the basis of state law, if the evidence was proper-

ly admissible under federal law. *See United States v. Morrison*, 153 F.3d 34, 37 (2d Cir. 1998); *United States v. Pforzheimer*, 826 F.2d 200, 204–05 (2d Cir.1987).

**4.** The motions to suppress the Mitsui tapes were submitted together with a series of other pre-trial motions. The Court has resolved the other motions in a separate opinion also issued today. None of those motions were at issue in the evidentiary hearing held on April 15–16, 2003.

reviewed tape recordings of certain phone transactions from the Securities Lending Department in order to verify those transactions against subsequent documentation. (Tr. at 106.) At the conclusion of the audit Bricker created a draft audit report that he discussed with senior Mitsui Trust managers, including DeHaven, on October 31, 1997. (Tr. at 108—111; Memorandum and Report of Audit of Securities Lending Area dated Nov. 3, 1997 ("Audit Report"), Gov. Ex. 5.) Bricker hand delivered a copy of the draft report to DeHaven and two other executives. (Tr. at 110.) After the meeting, Bricker hand delivered the final report to DeHaven and the other two executives. (Gov. Ex. 5; Tr. at 112.)

The Appendix to the report lists the steps Bricker took during the audit, including "tracing the transactions to phone recordings for accuracy." (Audit Report Appendix.) The report itself states clearly under the heading "Recorded Phone Line Review"—"The phones in the 'Trading Room' and in the Securities Lending Operations area are recorded in order to assist in the event that there is a dispute with a counterparty after a deal has been transacted." (Gov.Ex. 5.) Bricker asked for DeHaven's comments with regard to certain problems that became apparent when various transactions were traced from the transaction ticket to recorded phone calls over the course of the audit. (Audit Report at 1 and IV.B.2; Tr. at 114–119.) Although Bricker does not recall DeHaven's exact response, he is sure that De-

Haven did respond to the request because Bricker was responsible for ensuring that all audit concerns were properly addressed and never had a problem obtaining the necessary responses from the appropriate personnel. (Tr. at 118–19.) In an affidavit submitted to the Court DeHaven denies ever receiving the Audit Report or Bricker's accompanying memorandum soliciting his response. (Affidavit of Robert S. DeHaven sworn Mar. 21, 2003 ("DeHaven Aff.") ¶ 7.) That denial is not credible in view of Mr. Bricker's detailed testimony, his regular practice, and the explicit statements in the Audit Report.

■ In early 1999, Mitsui Trust senior management conducted an internal investigation into allegations by DeHaven's assistant that DeHaven was using company telephones and other facilities to conduct personal business from Mitsui Trust, including personal securities trading activities. (Kim Aff. ¶ 9; Tr. at 15–17.) At the suppression hearing, Adrienne Blitzer ("Blitzer"), the former Vice President for Human Resources at Mitsui Trust, (Tr. at 9), testified that, in March or April 1999, she met with DeHaven and Shigeru Sugimoto ("Sugimoto"), Senior Vice President of Mitsui Trust, about the allegations. (Tr. at 17, 319.) Blitzer testified that DeHaven denied the allegations and stated that "If you don't believe me, listen to the telephone tapes," which Blitzer understood to mean the tapes of all of his telephone calls from the trading room where he worked.[5] (Tr. at 14, 17, 23.)

---

5. At the suppression hearing, Agent Cecilia Fitzpatrick ("Agent Fitzpatrick") of the Federal Bureau of Investigation ("FBI") testified about an interview with Sugimoto conducted on April 10, 2003 via teleconference between New York and Japan in which she participated. (Tr. at 309–351.) Sugimoto could not testify at the suppression hearing because of a Mitsui policy banning employee travel due to current events in Iraq and because the Japanese government apparently would not allow him to testify by video conference. (Letter

from Assistant United States Attorney Timothy Coleman to the Court dated Apr. 14, 2003.) Certain defendants objected to Agent Fitzpatrick's testimony, and to other testimony at the hearing, on hearsay grounds. However, the Federal Rules of Evidence do not apply on a motion to suppress and hearsay thus is admissible, especially in view of corroborating evidence. *See United States v. Bin Laden,* 132 F.Supp.2d 198, 202 n. 8 (S.D.N.Y. 2001) (citing *United States v. Raddatz,* 447

Blitzer testified on cross examination, that despite forgetting certain details of the meeting she remembered "exactly what Bob [DeHaven] said because the way he said it was like, I can't believe you believe [the assistant] over me. That's the recollection. So that's what I remember." (Tr. at 89.) Blitzer, who no longer works for Mitsui Trust, testified that the comment was out of the ordinary, so she was "a hundred percent, I remember that." (*Id.*) Blitzer memorialized DeHaven's comment in a May 3, 1999 memorandum that she drafted summarizing the performance conference in which she wrote, "In our meeting, you stated that we should listen to the daily telephone tapes in the trading room to prove that [your assistant's] allegations are groundless and that your behavior in no way violates the policies of our bank or the governmental trading regulations." (Draft Memorandum dated May 3, 1999, Gov. Ex. 1.)

Blitzer subsequently listened to some of DeHaven's recorded conversations but was unable to determine whether a basis for the allegations existed because she could not understand the trading vocabu-

lary being used. (Tr. at 24.) Outside counsel was then hired to conduct the investigation. (Tr. at 25.) On May 5, 1999 DeHaven received a written warning from Sugimoto about, among other things, his excessive use of the Bank telephone for personal business. (Memorandum from Sugimoto to DeHaven dated May 5, 1999 attached as Ex. B to Kim Aff.) DeHaven acknowledges receipt of the memorandum but denies that he was ever informed that the reprimand resulted from anyone recording or listening to his telephone conversations. (DeHaven Aff. ¶ 10.) In fact, DeHaven denies ever knowing of or consenting to any recording or listening in connection with his phone conversations while at Mitsui Trust. (DeHaven Aff. ¶ 2.) [6] These denials are not credible given Blitzer's detailed and credible recollection of the meeting with DeHaven as well as her draft memo reflecting DeHaven's contemporaneous comment. Moreover, DeHaven's blanket denial of knowledge of the taping of and listening to his calls at Mitsui Trust is not only inconsistent with the events in the 1997 audit and the 1999 investigation, it is inconsistent with the

U.S. 667, 679, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)); *United States v. Ochs*, 461 F.Supp. 1, 7 (S.D.N.Y.1978). Agent Fitzpatrick testified that Sugimoto stated in the interview that when he confronted DeHaven in March 1999 about the allegations against him, DeHaven admitted to using company telephones for personal use, including to make stock trades, but denied doing anything illegal or committing any misconduct. (Tr. at 321.) Agent Fitzpatrick testified that Sugiomoto said that DeHaven "told Mr. Sugimoto if he thought he was doing some kind of misconduct that Mr. Sugimoto should listen to his recorded telephone tapes." (*Id.*) Sugimoto did not recall anyone else being present at the meeting when DeHaven allegedly made the statement. (*Id.*) In any event, the result in this case would be the same even without considering the hearsay statement from Sugimoto because Blitzer's detailed testimony to the same effect is completely credible.

**6.** In his affidavit DeHaven also denies making the statement attributed to him in the FBI's summary of an interview with DeHaven on June 27, 2001. (FBI 302 ("302") attached as Ex. A to Affidavit of Scott Thompson sworn Feb. 21, 2003.) The summary states, "Initially DEHAVEN was not aware that his telephone calls at MITSUI were being taped. He did eventually learn that they were and he was careful about what he said on the telephone." (302 at 4.) DeHaven attests that while he did tell the FBI that he eventually learned that his calls were being taped and/or listened to, he also told the FBI that he did not become aware of this fact until after he was terminated from Mitsui. (DeHaven Aff. ¶ 3.) This sworn statement by DeHaven is not credible and is inconsistent with the tape of the May 25, 2000 conversation, a portion of which was played at the hearing, in which DeHaven appeared to acknowledge that he was speaking on a recorded line.

other evidence of knowledge detailed below.

In July 1999 Mitsui Trust revamped its employee handbook ("1999 Handbook") and Blitzer distributed copies to employees the following month. (Tr. at 30.) The 1999 Handbook contained the following provision which, as far as Blitzer knows, is the first time that a section on taped telephone calls appeared in a Mitsui Trust employee handbook:

> For audit and control purposes, certain telephone lines of the Company are recorded. Please be aware that if you use one of the recorded telephone lines, your telephone conversations will be recorded and the Company has the right to review the recordings of such conversations and may be required to make such recordings available to the Company's regulators. For those employees who regularly use recorded telephone lines, the Company will require such employees to give their express written consent to such recording.

(1999 Handbook, Gov. Ex. 3 at 20; Tr. at 33–34.) Along with the 1999 Handbook Blitzer gave employees a memorandum and a form to acknowledge receipt of the materials. (Tr. at 31.) Blitzer testified that she knows that DeHaven received the 1999 Handbook and memorandum and filled out an acknowledgment form because all employees had done so. (Tr. at 31.) Blitzer kept a list of every employee's name that she would check off when they completed the form. (Tr. at 31.) When the list was complete Blitzer circulated the list to the compliance officer and senior management for approval before it was filed. (Tr. at 31.) Blitzer last saw the acknowledgment forms on July 31, 2001 when she packed her things into boxes before leaving the company which was then located in the World Trade Center. (Tr. at 32.) The boxes were left at Mitsui Trust and the people who took over her responsibilities and who were responsible for storing the boxes died in the attack on the World Trade Center on September 11, 2001. (Tr. at 7, 33.)

In the late fall of 1999 employees of the trust operations and the trading room were asked to fill out the written consent form referenced in the 1999 Handbook because their telephones were regularly taped. (Tr. at 35.) Blitzer testified that DeHaven signed a form giving express written consent to the taping. (Tr. at 35.) His name was checked off a list of relevant employees that Blitzer maintained and this list was also left at the Mitsui Trust office in the World Trade Center when she left the company. (Tr. at 35.)

Physical notice of the taping was also provided by the fall of 1999. (Tr. at 149.) At that time, Blitzer testified, she instructed her assistant to put stickers on the recorded phones because phones were being physically moved in the office and there was turnover in the trust area staff. (Tr. at 36.) Blitzer thus wanted to ensure that people using the phones knew that they were being recorded. (Tr. at 36.)

In March 2000 Blitzer worked on revisions to the 1999 Handbook. (Tr. at 36.) Blitzer is certain that DeHaven received a copy of the revised handbook ("2000 Handbook") because the same procedures were used in distributing the 2000 Handbook as were used during the previous distribution. (Tr. at 37.) The section entitled "Security" in the 2000 Handbook contained the same language about taped telephone lines as quoted above. (2000 Handbook, Gov. Ex. No. 4 at 22.) The section also included the following statement.

> The Company's primary concern is the protection of its employees and the Company property. In order to create a safe working environment for all, our premises are protected by an Employee Access Card System, Overhead Cam-

eras, Internet and E–Mail monitoring and selected taped telephone monitoring systems. *If necessary, the company has the right and will access this right to use information found from these systems when employees are deemed to have violated our company policies.* (2000 Handbook at 22 (emphasis added).)

In December 1999, the Government learned of allegations that DeHaven had agreed to make false representations to prospective Credit Bancorp, Ltd ("CBL") customers that Mitsui had entered into a financial transaction with CBL. (Affirmation of Timothy Coleman dated March 14, 2003 ("Coleman Aff.") at ¶ 33.) On May 24, 2000, Michelle Kim ("Kim"), then Compliance Officer for Mitsui, attended a meeting in which the FBI interviewed DeHaven regarding the allegations. (Kim Aff. ¶ 12; Tr. at 149–50.) The Government met with DeHaven for a second time in September 2000. (Coleman Aff. ¶ 33.) DeHaven denied the allegations at both meetings. (Coleman Aff. ¶ 33.)

Approximately one year later, in May 2001, Kim learned of the existence of seven DATs covering an almost continuous period between February 12, 1999 and May 29, 2001 that contained recordings of DeHaven's telephone conversations. (Kim Aff. ¶ 12; Tr. at 150.) Kim testified that at least some of these tapes had been retained as a result of the earlier internal investigation into DeHaven's activities after which outside counsel recommended that Mitsui Trust set aside the relevant tapes for future reference. (Tr. at 153.) There is a gap in the tapes from April 3, 1999 through June 21, 1999 and the tape or tapes covering this period were either re-used (recorded over) or otherwise not preserved. (Kim Aff. ¶ 12; Tr. at 170.)

Kim began listening to DeHaven's conversations on the DATs in May 2001 having decided to do so in her capacity as Mitsui Trust's Compliance Officer in consultation with senior management and outside counsel. (Kim Aff. ¶ 13; Tr. at 154.) Kim testified that she undertook the review in order to determine whether DeHaven had been involved in any criminal activity associated with the FBI's investigation and whether Mitsui Trust was at risk from DeHaven's alleged actions. (Kim Aff. ¶ 13; Tr. at 154–55.) Kim testified that she did not discuss her decision to review the tapes with the FBI, the United States Attorney's Office, or any other government agency, nor did she seek permission or instruction regarding her review. (Kim Aff. ¶ 13.; Coleman Aff. ¶ 36; Tr. at 153–54, 172.)

Kim reviewed the tapes as follows. First, she listened to a random sample of calls on the multi-channel tapes and determined that DeHaven's calls were recorded primarily on channels five and six. (Kim Aff. ¶ 14; Tr. at 155, 164.) Next, she listened to all calls on those channels in chronological order that were either calls between DeHaven and persons she identified as the defendants Rittweger or Wexler, or calls between DeHaven and others that appeared to relate to Rittweger, Wexler, or CBL. (Kim Aff. ¶ 14; Tr. at 164.) Kim kept a list of calls that seemingly fell into these categories. (Kim Aff. ¶ 14; Tr. at 164–67.) She did not listen to calls in their entirety that appeared to be purely personal or that did not appear to relate to Rittweger, Wexler, or CBL. (Kim Aff. ¶ 14.) Nor did she generally listen to calls involving legitimate Mitsui Trust business. (Kim Aff. ¶ 14.) Kim estimates that between approximately May 2001 and early September 2001 she listened to thousands of DeHaven's recorded telephone calls. (Kim Aff. ¶ 15.)

Also in May 2001, the Government was advised by an attorney at the firm of Simpson Thatcher & Bartlett that Mitsui Trust possessed recordings of DeHaven's

telephone conversations. (Coleman Aff. ¶ 34.) The Government denies any prior knowledge of the Mitsui tapes or any involvement in their making. (Coleman Aff. ¶ 34.) On June 6, 2001, Mitsui allegedly identified the tapes in its possession to the Government, and on June 13, 2001 the Government issued a grand jury subpoena to Mitsui Trust for the production of the tapes. (Coleman Aff. ¶ 35.)

In June 2001 Kim provided the FBI with the original DATs in question, as well as with a Racal machine that could be used to listen to the recordings. (Kim Aff. ¶ 15.) She continued her own review using another machine and copies of the tapes until September 10, 2001. (Kim Aff. ¶¶ 15–16.) Kim periodically provided the FBI with a list of calls recorded prior to May 25, 2000 that she considered potentially relevant to the FBI investigation. (Kim Aff. ¶ 15; Tr. at 171.) On September 11, 2001 all of Kim's materials were lost when Mitsui Trust's offices were destroyed in the collapse of the World Trade Center. (Kim Aff. ¶¶ 11, 16.)

DeHaven has submitted an affidavit in which he attests that at no time during his employment at Mitsui Trust did he consent to anyone recording or listening to his telephone conversations. (DeHaven Aff. ¶ 2.) DeHaven denies receiving Bricker's November 3, 1997 memorandum and states that "at no time prior to my termination at Mitsui did I learn that my telephone conversations were either listened to or recorded." (DeHaven Aff. ¶ 2, 7.) In addition to the evidence explained above, these assertions by DeHaven are further undermined by the recording made by Mitsui Trust on May 25, 2000 of a conversation between DeHaven and a person alleged to be defendant Wexler, which was played at the hearing, and in which that person asked, "[I]s this a recorded line?" and DeHaven responded "Uh-huh." (Transcript of Tape No. 130 dated May 25, 2000 attached as Ex. A to Gov. Sur–Reply.)

The Court heard extensive testimony during the suppression hearing contradicting the statements in DeHaven's affidavit. In view of that credible testimony, the Court finds that DeHaven's claims that he was unaware that his conversations were being taped are not credible. Moreover, DeHaven's denials that he consented to the taping of his conversations and to his employer's listening to those conversations are also not credible in view of, among other things, his 1999 invitation to listen to his telephone calls, his acknowledgment of the receipt of the Employee Handbooks, his written express consent form, and his continued knowing use of the phones despite his knowledge of the taping.

## II.

Title III makes it unlawful, among other things, intentionally to (1) "intercept" any "wire, oral, or electronic communication"; (2) use an "electronic, mechanical, or other device" to do so under certain circumstances; (3) disclose to any person the "contents of any wire, oral, or electronic communication knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication" in violation of the statute; or (4) use or endeavor to use the contents of any such communication knowing or having reason to know that it was intercepted in violation of the statute. See 18 U.S.C. § 2511(1)(a)-(d); *Arias v. Mutual Central Alarm Service, Inc.*, 202 F.3d 553, 556–57 (2d Cir.2000). The Government argues that the Mitsui tapes are admissible under three exceptions to Title III: the clean hands exception, the ordinary course of business exception, and the consent exception. The defendants bear the burden of proof on the first two of these exceptions, and the Gov-

ernment bears the burden of proof as to the consent exception. *See United States v. Magaddino,* 496 F.2d 455, 459–60 (2d Cir.1974) (burden of proof on the accused to prove wire tapping was unlawfully employed); *United States v. Boston,* 508 F.2d 1171, 1178 (2d Cir.1974) (Government must prove by a preponderance of the evidence that consent was freely and voluntarily given). The Government has proven that the consent exception applies and it is therefore unnecessary to decide whether the other two exceptions apply in this case. Those exceptions are set forth briefly below solely for the sake of completeness.

The Government urges the Court to follow the Sixth Circuit Court of Appeals' decision in *United States v. Murdock,* 63 F.3d 1391 (6th Cir.1995) and to apply a clean hands exception in this case. In *Murdock,* the Sixth Circuit Court of Appeals upheld the admission at trial of tape recordings of the defendant's telephone conversations made by the defendant's wife in violation of Title III because the government played no part in the unlawful interceptions. *Id.* at 1404. The Government argues in this case that because it played no role in Mitsui Trust's decision to record DeHaven's conversations or to review the DAT's in the course of the company's subsequent internal investigation, the Government's "clean hands" render the tapes admissible at trial. However, the Second Circuit Court of Appeals has not ruled on the viability of a clean hands exception to Title III and several other Courts of Appeals have found that such an exception does not exist. The Courts have relied on, among other things, Title III's prohibition not only against "interception" but also against "use" and "disclosure." *See, e.g., Berry v. Funk,* 146 F.3d 1003, 1013 (D.C.Cir.1998) (rejecting the clean hands exception because it did not "square with [Title III's] language"); *Chandler v. United States Army,* 125 F.3d 1296, 1302 (9th Cir.1997) (rejecting the clean hands

exception based on the statutory language and a finding that the purpose of Title III was to prevent both private and governmental wiretapping); *In re Grand Jury,* 111 F.3d 1066, 1078 (3d Cir.1997) (finding no Congressional intent supporting the clean hands exception based on the plain language of Title III); *United States v. Vest,* 813 F.2d 477, 481 (1st Cir.1987) (declining to recognize a clean hands exception in part because of Congressional concern about the invasion of privacy when enacting Title III). Because DeHaven clearly gave consent in this case and because the Second Circuit Court of Appeals has not reached the question of whether there is a clean hands exception to Title III it is unnecessary to reach that question in this case.

Similarly, the Government asks the Court to conclude that the Mitsui tapes are admissible under the ordinary course of business exception pursuant to 18 U.S.C. § 2510(5)(a)(1). The parties do not dispute that Mitsui recorded DeHaven's conversations during the ordinary course of business. However, the defendants argue that Kim's act of listening to the tapes during her internal investigation did not occur during the ordinary course of business and thus the exception does not apply. *See generally Arias,* 202 F.3d at 558 ("We do not doubt that listening would constitute 'aural acquisition' within the meaning of Title III.") It is unnecessary to decide whether Kim's review of the tapes constituted part of Mitsui Trust's ordinary course of business.

 The Mitsui tapes are admissible under the consent exception to Title III. *See* 28 U.S.C. § 2511(2)(d). Under the consent exception, there can be no violation of Title III when a telephone call is intercepted if "one of the parties to the communication has given prior to consent to such interception," unless the intercep-

tion is for a criminal or tortious purpose. *Id.* This consent can be either express or implied. *Arias,* 202 F.3d at 558–59 (citing *United States v. Workman,* 80 F.3d 688, 692–93 (2d Cir.1996)). Moreover, the Second Circuit Court of Appeals has made clear that "Congress intended the consent requirement to be construed broadly." *United States v. Amen,* 831 F.2d 373, 378 (2d Cir.1987); *accord Workman,* 80 F.3d at 693. In this case there is ample evidence that DeHaven gave consent to Mitsui Trust's interception of his phone calls.

■ The evidence shows that as early as 1997 DeHaven gave implied consent to such interception by continuing to use the phones after he was put on notice in Bricker's memorandum dated November 3, 1997 that the calls were being recorded and reviewed. *See Amen,* 831 F.2d at 379 (prisoners had notice of prison telephone interception system and thus their use of the telephones constituted implied consent to monitoring); *accord Workman,* 80 F.3d at 693 (finding consent even though appellant, having been warned of monitoring, was not specifically told that use of prison telephones constituted consent or that monitoring could include recording); *United States v. Willoughby,* 860 F.2d 15, 19–20 (2d Cir.1988) (implied consent given to monitoring and taping when prison gave ample notice that phones were taped and monitored and prisoner used phones; express consent also found based on prisoner execution of consent form). Bricker's memorandum specifically stated that the internal audit had included reviewing tape recordings of transactions conducted by telephone in the Securities Lending Department. DeHaven's testimony that he did not receive the memorandum, in view of Bricker's testimony corroborated by a copy of the dated memorandum, is not believable.

Two years later, DeHaven expressly acknowledged that he was aware of the tapping and consented to having his calls listened to when he told Blitzer to check the tapes if she did not believe his defense to the allegations lodged against him by his assistant. DeHaven's statement was not only an expression of explicit consent to the playing of the tapes, it was also an implicit acknowledgment that he knew that the phone calls were being recorded.

Shortly thereafter, DeHaven received the 1999 Handbook that explicitly stated that company calls were subject to recording. The 1999 Handbook, like the 2000 Handbook, made it clear not only that the telephone calls would be recorded but also that "the Company has the right to review the recordings of such conversations." DeHaven signed acknowledgment forms stating both that he received the handbook and that, as an employee whose phone was regularly recorded, he consented to such taping. DeHaven makes no reference to either the 1999 or 2000 Handbooks in his affidavit but instead comments on the fact that a 1994 version did not contain similar provisions. (DeHaven Aff. ¶ 9.) By the fall of 1999, warning stickers were also placed on the phones being taped and DeHaven continued to use the phones, thus supporting the finding of consent.

The moving defendants argue that Kim's review of the tapes during 2001 was not within the scope of the consent implied by or expressly given by DeHaven. The defendants rely on the decision by the Eleventh Circuit Court of Appeals in *Watkins v. L.M. Berry & Co.,* 704 F.2d 577, 582 (11th Cir.1983). *Watkins,* however, does not support the moving defendants' position. In *Watkins,* the Court of Appeals found that an employer had not established that an employee consented to the employer listening to a personal telephone call where the employee did not consent to a policy of general monitoring, but consented only to a policy of monitoring sales

calls, but not personal calls. The consent included inadvertent interception of a personal call, but only for as long as necessary to determine the nature of the call. *Id.* at 581. The Court distinguished cases finding implied consent where people knew that telephone lines were constantly monitored for various business purposes. *See id.* at 581–82.

In this case, unlike *Watkins,* DeHaven knew that the lines in the securities lending area were continuously taped and Mitsui reserved the right to listen to those tapes, and the Employee Handbooks made it clear that Mitsui had the right to review the recordings of those telephone conversations. Despite those warnings, DeHaven chose to continue to use those phones. This is not the case of the limited consent at issue in *Watkins.*

Moreover, the Court of Appeals for the Second Circuit has made it clear that consent is to be construed broadly. *See, e.g., Workman,* 80 F.3d at 693; *Amen,* 831 F.2d at 378; *see also United States v. Tzakis,* 736 F.2d 867, 871–72 (2d Cir.1984) (finding no authority to support the appellant's alleged distinction between the scope of the consent given in the case and the monitoring that actually occurred). Moreover, in *United States v. Martignoni,* No. 92 Cr. 1097, 1993 WL 204811, at *1–2 (S.D.N.Y. June 7, 1993), Judge Keenan of this Court found that the defendant in that case consented to having his private calls recorded even though the purpose of the taping was to make a record of foreign exchange option trades negotiated over the telephone in case a dispute arose over the terms of a trade.

In this case, Kim reviewed the Mitsui tapes between May and September 2001 in connection with her investigation into DeHaven's actions. Kim was concerned about DeHaven's alleged wrongdoing and the potential effects of his actions on Mitsui Trust. DeHaven impliedly and expressly consented to the recording of all of his telephone calls in question. In addition, by the time of Kim's investigation, DeHaven had already acknowledged receiving the 2000 Handbook. He had thus consented to the specific provision therein providing that "If necessary, the company has the right and will access this right to use information found from [telephone recordings] when employees are deemed to have violated our company policies." (2000 Handbook at 22.) The 2000 Handbook also reiterated the warning in the 1999 Handbook that "the Company has the right to review the recordings of such conversations." Kim's review of the Mitsui tapes was well within the scope of DeHaven's consent.

### CONCLUSION

The remaining arguments of the parties are either moot or without merit. For the reasons explained above, the motion to suppress the Mitsui tapes is denied.

**SO ORDERED.**